Case No. 25-3035

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

THERESA A. KOVACS

Plaintiff-Appellant

v.

UNIVERSITY OF TOLEDO

Defendant-Appellee

APPEAL FROM THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

BRIEF OF APPELLANT THERESA A. KOVACS

Ellen M. Kramer (0055552)
emk@crklaw.com
Joshua R. Cohen (0032368)
jcohen@crklaw.com
Cohen Rosental + Kramer LLP
3208 Clinton Avenue
One Clinton Place
Cleveland, Ohio 44113
Phone: (216) 815-9500
Fax: (216) 781-8061

Counsel for Appellant

Oral Argument Requested

# UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| **THERESA A. KOVACS,** | ) | **CASE NO. 25-3035** |
| | ) | |
| **Plaintiff-Appellant** | ) | |
| | ) | |
| v. | ) | **APPEAL FROM THE UNITED** |
| | ) | **STATES DISTRICT COURT** |
| **UNIVERSITY OF TOLEDO,** | ) | **FOR THE NORTHERN** |
| | ) | **DISTRICT OF OHIO,** |
| **Defendant-Appellee** | ) | **WESTERN DIVISION** |
| | ) | **CASE. NO. 3:22-CV-02151** |
| | ) | |
| | ) | **ORAL ARGUMENT** |
| | ) | **REQUESTED** |

---

## DISCLOSURE OF CORPORATE AFFILIATIONS
## AND FINANCIAL INTEREST

---

Pursuant to 6th Cir.R. 26.1, Appellant Theresa A. Kovacs makes the following disclosure:

1. Is said party a subsidiary or affiliate of a publicly owned corporation?

   No.

2. Is there a publicly owned corporation, not a party to the appeal that has a financial interest in the outcome?

   No.

/s/ Ellen M. Kramer                    03/17/2025
Ellen M. Kramer (0055552)              Date
Attorney for Appellant

ii

# TABLE OF CONTENTS

**DISCLOSURE OF CORPORATE AFFILIATIONS  AND FINANCIAL INTEREST** ...... ii

**TABLE OF CONTENTS** ........................................................................................... iii

TABLE OF AUTHORITIES ........................................................................................ vi

**APPELLANT'S BRIEF** ............................................................................................... 1

**STATEMENT IN SUPPORT OF ORAL ARGUMENT** ....................................... 1

**STATEMENT OF JURISDICTION** ....................................................................... 1

**STATEMENT OF ISSUES** ....................................................................................... 2

    I.    Was it error to ignore the Ohio Civil Rights Commission ("OCRC") Probable Cause Finding in favor of Appellant Theresa A. Kovacs ("Kovacs") when considering Appellee University of Toledo's (the "University") Motion for Summary Judgment? ................... 2

    II.    Was it error to find that Kovacs relied only on temporal proximity between the protected activity and her termination to establish a causal connection? ......................................... 2

    III.    Was it error to find that the OCRC Probable Cause Finding presented trustworthiness problems? ............................................................................................................................... 2

    IV.    Was it error to find that the University met its burden of establishing that the OCRC Probable Cause Finding was untrustworthy and therefore should not be considered in ruling on the University's Motion for Summary Judgment? ............................................. 2

    V.    Was it error to disregard the OCRC Probable Cause Finding on grounds that the Finding is confusing and unhelpful to a factfinder? ........................................................................ 2

    VI.    Was it error to find that there were no genuine issues of material fact and the University was entitled to judgment as a matter of law on Kovacs' claim that she was terminated unlawfully? ............................................................................................................................ 2

    VII.    Was it error to find Kovacs did not set forth the reason why the Probable Cause Finding should be evaluated as a causation factor in establishing her case and, therefore, waived the argument ...................................................................................................................... 3

**STATEMENT OF THE CASE** ................................................................................. 3

**OVERVIEW OF APPELLANT'S CLAIMS** .......................................................... 4

**STATEMENT OF FACTS** ........................................................................................ 4

    A.    **Kovacs was an exemplary University employee for 18 years.** .......................... 4

    B.    **Matt Schroeder's close connections to Jason Toth and the HR Department.** ........... 6

    C.    **Kovacs engages in protected activity in October of 2020.** ............................ 7

    D.    **Kovacs's demotion and its shifting reasons.** .................................................. 10

    E.    **Several African American HR Directors are terminated between September of 2020 and January of 2021.** ...................................................................................... 11

    F.    **Kovacs is identified as a comparator by an African American HR employee who**

**notifies the University's President that he plans to bring employment discrimination charges.** ........................................................................ 13

   **G.**   **Shifting reasons for Kovacs's termination.** ............................................. 14

   **H.**   **Elliott and Hurst's testimony regarding Kovacs's job performance is not credible** 16

   **I.**   **Elliott and Hurst owe their University positions solely to Schroeder and Postel.** ... 18

   **J.**   **Kovacs's OCRC Probable Cause Finding** ............................................. 19

   **K.**   **Failure to consider OCRC Probable Cause Finding** .......................... 21

   **L.**   **Kovacs's request for reconsideration.** ............................................... 21

   **M.**   **Relevance of OCRC Probable Cause Finding.** .................................. 22

   **N.**   **Additional Evidence of Causal Connection.** ..................................... 24

**STANDARD OF REVIEW** ........................................................................... 26

**ARGUMENT** ................................................................................................ 27

   **A.**   **Ohio's employment discrimination law procedures make the Probable Cause Finding significant.** ................................................................... 29

   **B.**   **F.R.E 803(8) required that the Probable Cause Finding be considered by the trial court.** ................................................................................ 30

     **1.**   **The Probable Cause Finding is not largely hearsay.** ........................... 32

     **2.**   **The University did not and cannot show that the Probable Cause Finding is untrustworthy.** ................................................................................ 32

       **a.**   **The University failed to demonstrate that the investigation on which the Probable Cause Finding was based was not timely.** ............................. 33

       **b.**   **The University did not establish that the investigator lacked special skill or experience.** ................................................................................ 33

       **c.**   **The University did not establish that the OCRC did not hold a hearing.** ......... 33

       **d.**   **The University did not establish that the OCRC had motivational problems.** .. 34

     **3.**   **Confusion to the jury is not relevant in ruling on a motion for summary judgment.** ................................................................................ 34

   **C.**   **If the District Court had considered the Probable Cause Finding it would have found that Kovacs established a prima facie case of a causal connection between the protected activity and her termination.** .................................. 35

   **D.**   **Kovacs presented other circumstantial evidence of a causal connection.** ................. 37

   **E.**   **Kovacs did not waive the argument regarding causal connection.** .......................... 38

   **F.**   **The District Court's disregard for the Probable Cause Finding is wasteful.** ........... 39

**CONCLUSION** ........................................................................................... 42

**CERTIFICATE OF COMPLIANCE** ......................................................... 44

**CERTIFICATE OF SERVICE** ............................................................................ 45

**ADDENDUM** ....................................................................................................... 46

## TABLE OF AUTHORITIES

**Cases**

*Adams v. Ameritech Servs., Inc.*, 237 F.3d 414, 428 (7th Cir. 2000) .......................35

*Alexander v. CareSource,* 576 F.3d 551, 561 (6th Cir. 2009).................... 22, 30, 31

*Ames v. Ohio Dep't of Youth Services*, 87 F.4th 822, 824 (6th Cir. 2023). ...............27

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ...................................26

*Baker DC, LLC v. Acosta*, No. 1:17-CV-530, 2018 WL 1696799, at *1 (S.D. Ohio Apr. 6, 2018) ........................................................................................................8

*Blank v. Nationwide Mutual Insurance Co.*, 2024-Ohio-2500, 247 N.E.d.3d 555, ¶19 n.6 (10th Dist.) ...............................................................................................29

*Bradshaw v. Zoological Soc. Of San Diego*, 569 F.2d 1066, 1069 (9th Cir. 1978)..40

*Burch v. Ohio Farmers Ins. Co.*, 2023-Ohio-912, 211 N.E.3d 202, 203-04, ¶3 (5th Dist.)....................................................................................................................28

*Chavez v. Carranza*, 559 F.3d 486, 496 (6th Cir. 2009) .........................................31

*Coleman v. Home Depot, Inc.*, 306 F.3d 1333, 1344 (3rd Cir. 2002) ......................40

*Elek v. Huntington Natl Bank*, 60 Ohio St.3d 135, 140. 573 N.E.2d 1056, 1061, n.4 (1991)............................................................................................................ 29, 33

*George v. Youngstown State Univ.*, 966 F.3d 446, 462 (6th Cir. 2020)........ 26, 27, 35

*Guerra v. Convergys Customer Management Group, Inc.*, Case No. C-1-08-666, 2010 WL 3522472, *11 (S.D. Ohio Sept. 7, 2010) ................................................5

*Harmon v. Honeywell Intelligrated*, 2024 WL 4117026, *3 (6th Cir. Aug. 15, 2024) ..........................................................................................................................30

*Helphenstine v. Lewis County, Kentucky*, 60 F.4th 305, 314 (6th Cir. 2023)............26

*Hostettler v. College of Wooster*, 895 F.3d 844, 852 (6th Cir. 2018).......................26

*In re Chiquita Brands Int'l, Inc. v. Allen Torts Statute and Shareholder Derivative Litigation*, Case No. 08-MD-01916, 2022 WL 18957608, *23, n.39 (S.D. Fl. Dec. 14, 2022).................................................................................................35

*Jones v. Fluor Facility & Plant Services*, No. 24-5249, 2025 WL 707869, *5 (6th Cir. Mar. 5, 2025).................................................................................................26

*Kenney v. Aspen Technologies, Inc.*, 965 F.3d 443, 448 (6th Cir. 2020) .................36

*Kimble v. Wasylyshyn*, 439 Fed.Appx. 492, 500 (6th Cir. 2011) ..............................31

*Kirilenko-Ison v. Bd. Of Educ. Of Danville Independent Schools*, 974 F.3d 652, 666 (6th Cir. 2020)........................................................................................... 36, 42

*Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014) ..............................27

*Lopez v. Kempthorne*, 684 F.Supp.2d 827, 888-89 (S.D. Tex. 2010) ......................40

*Martin v. Saginaw County Road Comm'n*, 606 F.Supp.3d 639, 649 (E.D. Mich. 2022) ........................................................................................................26

*Matthew v. Waukesha County*, 937 F.Supp.2d 975, 982 (E.D. Wis. 2013)..............35

*McCrimon v. Inner City Nursing Home, Inc.*, Case No. 1:10 CV 392, 2011 WL 4632865, *10 (N.D. Ohio Sept. 30, 2011)................................................................5

*Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 598 (6th Cir. 2007)............5

*Muhammad v. Close*, 379 F.3d 413, 416 (6th Cir. 2004) .........................................26

*O'Neill v. Scripps Media, Inc.*, Case No. 1:23-cv-410, 2024 WL 836955, *11 (S.D. Ohio Feb. 28, 2024) ............................................................................................36

*Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016).............................41

*Plummer v. Western Intern. Hotels,* 656 F.2d 502, 505 (9th Cir. 1981)....................40

*Rembert v. Swagelok Co.*, 604 F.Supp.3d 670, 686 (N.D. Ohio 2022)...................31

*Saley v. Caney Ford, LLC*, 886 F.Supp.2d 837, 846 (M.D. Tenn. 2012)...................5

*Sandman v. New York Times Company*, 78 F.4th 319, 328 (6th Cir. 2023) ..............25

*Simpkins v. Boyd County Fiscal Court*, 2022 WL 14446819, *10 (6th Cir. 2022). 30, 32

*Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 55, 546 (6th Cir. 2004)................27

*Smith v. Universal Services, Inc.*, 454 F.2d 154, 157 (5th Cir. 1972) ......................40

*Stewart v. Harlan City Police Dep't*, No. 6:13-66-DCR, 2014 WL 5364809, *5 (E.D. Ky. Oct. 21, 2014) ........................................................................................35

*Tynes v. Forida Dep,t of Juvenile Justice*, 88 F.4th 939, 941 (11th Cir. 2023)........41

*United States Fire Ins. Co. v. City of Warren*, No 10-cv-13128, 2012 Wl 13006156, *4 (E.D. Mich. June 12, 2012)...............................................................................35

*Walia v. Potter,* No. C09-1199JLR, 2012 WL 12977878, *1 (W.D. Wash. 2012)...40

*Willard v. Huntington Ford, Inc.*, 952 F.3d 795, 810 (6th Cir. 2020) ......................27

*Wrenn v. Gould*, 808 F.2d 493, 499 (6th Cir. 1987) ...................................................31

**Statutes**

28 U.S.C. § 1291 ...........................................................................................................1

Employment Law Uniformity Act ..............................................................................29

Title VII of the Civil Rights Act of 1964, 42 USC § 2000e-2 ...................... 3, 27, 41

**Rules**

F.R.E. 403 .................................................................................. 34, 35

F.R.E. 803(6) ...................................................................................40

F.R.E. 803(8) ............................................................. 30, 31, 32, 39

O.R.C. § 4112.05 ...........................................................................29

O.R.C. § 4112.051 ..........................................................................29

O.R.C. § 4112.052 ..........................................................................39

**Treatises**

2 McCormick on Evid. § 296 (6th ed.) ..................................................22

## APPELLANT'S BRIEF

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

Oral argument should be scheduled in this case to assist this court in reaching a full understanding of all relevant issues and underlying facts. Oral argument will also conclusively demonstrate the errors in the District Court's decision, including by granting summary judgment despite sufficient evidence of the type which this Court has held is sufficient to overcome summary judgment. Oral argument would also allow the attorneys for the parties to address what, if any, outstanding factual or legal issues this Court wishes to consider.

## STATEMENT OF JURISDICTION

The Opinion and Order Granting Defendant's Motion for Summary Judgment is unreported and in the Electronic Court Filing system. Opinion, RE 34. The judgment of the United States District Court for the Northern District of Ohio was entered on January 21, 2025. Judgment, RE 64. Appellant Theresa A. Kovacs ("Kovacs") timely filed her appeal on January 21, 2025. Notice of Appeal, RE 65. The jurisdiction of this Court is invoked under 28 U.S.C. § 1291. This appeal is from the final judgment of the District Court disposing of all claims in this case.

## **STATEMENT OF ISSUES**

I.      Was it error to ignore the Ohio Civil Rights Commission ("OCRC") Probable Cause Finding in favor of Appellant Theresa A. Kovacs ("Kovacs") when considering Appellee University of Toledo's (the "University") Motion for Summary Judgment?

II.     Was it error to find that Kovacs relied only on temporal proximity between the protected activity and her termination to establish a causal connection?

III.    Was it error to find that the OCRC Probable Cause Finding presented trustworthiness problems?

IV.     Was it error to find that the University met its burden of establishing that the OCRC Probable Cause Finding was untrustworthy and therefore should not be considered in ruling on the University's Motion for Summary Judgment?

V.      Was it error to disregard the OCRC Probable Cause Finding on grounds that the Finding is confusing and unhelpful to a factfinder?

VI.     Was it error to find that there were no genuine issues of material fact and the University was entitled to judgment as a matter of law on Kovacs' claim that she was terminated unlawfully?

VII.   Was it error to find Kovacs did not set forth the reason why the Probable

Cause Finding should be evaluated as a causation factor in establishing her

case and, therefore, waived the argument.

## STATEMENT OF THE CASE

Kovacs, a Caucasian HR employee for the University, was demoted in

November of 2020 for advocating with the University's HR Department that HR

follow laws which serve to protect unlawful discrimination.  Kovacs's demotion was

subsequently changed to a termination, but not because of any performance

problems.  Rather, Kovacs was fired exactly two weeks after the University's

administration was notified that she would be used as a white comparator by African

American HR employees who had been fired.  Kovacs was fired because of her race.

In February of 2021, prior to filing this case, Kovacs submitted a charge

against the University to the Ohio Civil Rights Commission alleging that she had

been unlawfully discriminated against by the University when she was demoted and

terminated for engaging in protected conduct.

Kovacs was issued a Notice of Right to Sue by the OCRC in November of

2021, and in November of 2022, filed a complaint against the University in the

United States District Court for the Northern District of Ohio alleging that the

University violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2

when it demoted and then terminated her in February 2021.  Complaint, RE 1.

3

Following discovery, the University filed a Motion for Summary Judgment ("MSJ"), and Kovacs filed an opposition to the MSJ. MSJ, RE 18; Brief in Opposition, RE 31. The University filed a reply in support of its MSJ. Reply, RE 33.

On January 10, 2024, the District Court issued an Opinion and Order Granting the University's MSJ on the Plaintiff's claim for unlawful termination and denying the MSJ on the Plaintiff's claim of unlawful demotion. Opinion, RE 34. The District Court entered an order terminating the action on January 21, 2025. Judgment, RE 64. Kovacs filed a Notice of Appeal on January 23, 2025. Notice of Appeal, RE 65.

## OVERVIEW OF APPELLANT'S CLAIMS

## STATEMENT OF FACTS

### A. Kovacs was an exemplary University employee for 18 years.

Kovacs was originally hired by the University's Human Resources ("HR") Department in January of 2003 as a Benefits Specialist. Kovacs's Depo. Transcript, RE 14-1, Page ID# 151-52. Kovacs was a high-performing and well-liked employee, who was awarded promotion after promotion during her ensuing 18 years of employment with the University. In 2007, she was promoted to the position of Senior HR Specialist. *Id.* at 152. In March of 2012 she became the University's Interim Director of Talent Management, and the following April, became the Permanent Director. *Id*. at 152-53. Three and a half years later, in November of 2016, Kovacs was promoted to interim Director of HR Main Campus

4

Academic and Talent Management and was named Permanent Director in April of 2018. *Id.* at 153.

In Kovacs's three annual reviews during her tenure as Director of HR and Talent Development, she received an overall score of 4 on a scale of 1-5, meaning that she "frequently" exceeded performance expectations. Kovacs's Declaration, RE 25-1, PageID# 2613. In the annual performance review Kovacs received **<u>approximately three weeks before she was demoted</u>**, Kovacs again was awarded an overall rating of 4 and also received commendation for being a "pleasure to work with" and "very helpful to everyone" along with praise for being "instrumental in accomplishing a number of tasks quickly." John Elliott Depo. Transcript, RE 15-1, Page ID# 695-697.

Two of Kovacs's longtime co-workers describe her as a "strong leader," "very approachable," and an "outstanding supervisor and mentor." Motion for Judicial Notice, RE 22-1, PageID# 1321[1]; Keenan Fisher Declaration, RE 25-2,

---

[1] While witness statements incorporated into an EEOC investigative report may not be offered for the truth of the matter asserted, they may be considered on summary judgment "to demonstrate the state of mind and motive" of an employer in discharging an employee. *Saley v. Caney Ford, LLC*, 886 F.Supp.2d 837, 846 (M.D. Tenn. 2012) (quoting *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 598 (6th Cir. 2007)) (additional citations omitted). *See also Detillion v. Ohio Dep't of Rehab. & Correction*, Case No. 24-3347, 2024 WL 4850752, *4 (6th Cir.) (citation omitted); *McCrimon v. Inner City Nursing Home, Inc.*, Case No. 1:10 CV 392, 2011 WL 4632865, *10 (N.D. Ohio Sept. 30, 2011).

PageID# 2617-18. A third member of Kovacs's HR team considered Kovacs to be a good supervisor and described her as "positive," "approachable" and "always willing to help."  Chandra Reinhart Declaration, RE 29, PageID# 2662-63.

Kovacs was never disciplined during her 18 years with the University.

## B. **Matt Schroeder's close connections to Jason Toth and the HR Department.**

White male Matt Schroeder became the University's Executive VP for Finance and Administration and Chief Financial Officer in January 2019.  Matt Schroeder Depo. Transcript, RE 17-1, PageID# 915.  At that time the HR Department, including Kovacs, began reporting to Schroeder.  Gregory Postel Depo. Transcript, RE 20-1, PageID# 1140, 1169.  University employee Jason Toth, another white male, also began reporting directly to Schroeder at that time. *Id.*  Toth had a reputation of being very demanding in his dealings with HR, while Schroeder had a history of inserting himself into the HR process to make sure Toth's HR requests were granted.  Kovacs's Declaration, RE 30-1, PageID# 2664-65.

---

Courts may also consider on summary judgment witness statements contained in other investigative reports to demonstrate the state of mind and motive of an employer's managers in terminating an employee. *Guerra v. Convergys Customer Management Group, Inc.*, Case No. C-1-08-666, 2010 WL 3522472, *11 (S.D. Ohio Sept. 7, 2010) (citation omitted).  As the University raised the honest belief rule in its MSJ, interview statements to the OCRC are admissible to refute the University's "honest belief" argument and to demonstrate the state of mind and motive of the University.

Schroeder also was heavily involved in the University's labor programs and in developing related strategy. Elliott Depo., RE 15-1, PageID# 642. According to the University's Chief HR Officer during the time period relevant to this case, Schroeder was kept up to date on everything going on in HR, including positions that were being filled, and was "very dialed into every area of his responsibility," including HR. *Id.* at 642, 647-48.

## C. **Kovacs engages in protected activity in October of 2020.**

In early September 2020 Toth reached out to HR because he wanted to change the position and title of University employee Tracey Brown. Schroeder Depo., RE 17-1, Page ID# 945. Specifically, Toth sought to transfer Brown from a union to a non-union position and give Brown a raise without posting the new position for anyone else to see and apply. Kovacs's Declar., RE 30-1, PageID# 2669. In early September, Toth discussed this so-called "Tracey Brown Proposal with Schroeder, who testified that he "encouraged Toth to work through HR". Schroeder Depo., RE 17-1, PageID# 951-52.

Schroeder's emails tell a different story, however. Despite Schroeder's testimony that he encouraged Toth to work through HR, Schroeder inserted himself directly into the HR process to pressure HR for Toth. For example, Schroeder sent University Chief of Human Resources Officer Wendy Davis an email on September 10, 2020, regarding "Tracey's proposed position" which

7

stated: "Pursuant to our conversation, okay to proceed." *Id*. at 945-55, 1024.

Schroeder reached out to HR about the Tracey Brown Proposal again in early October. *Id.* at 952-53. On October 5, 2020, Schroeder's direct report, Sabrina Taylor, the University's Associate VP of Budget and Planning, called Kovacs to check on the status of the Tracey Brown Proposal. Kovacs's Depo., RE 14-1, PageID# 231-34. In this call Kovacs told Taylor that there were numerous problems with the Proposal. *Id.* at 236-39; Kovacs's Declar., RE 30-1, PageID# 2669. In this call Kovacs also identified issues with the union, the Office of Federal Contract Compliance Program ("OFCCP")[2], Equal Employment Opportunity ("EEO") laws and disparate impact on minorities or non-white applicants which could result from what Toth was proposing with Tracey Brown. *Id.*

Despite Kovacs's concerns about the lawfulness of the Tracey Brown proposal, Schroeder continued to pressure her to approve it. Schroeder and Kovacs spoke on the phone about the Tracey Brown Proposal on October 6, 2020.

---

[2] The United States Department of Labor, Office of Federal Contractor Compliance Programs ("OFCCP") ensures that covered federal contractors and subcontractors comply with certain federal legal requirements to not discriminate based on race, color, sex, sexual orientation, gender identity, religion, national origin, disability, or status as a protected veteran. *Baker DC, LLC v. Acosta*, No. 1:17-CV-530, 2018 WL 1696799, *1 (S.D. Ohio Apr. 6, 2018). The University is subject to this program. MSJ, RE 18, PageID# 1060.

Schroeder Depo., RE 17-1, PageID# 960. In this conversation Kovacs warned Schroeder that there were potential problems with Toth's proposal to move Tracey Brown relating to the OFCCP, EEO laws and disparate impact on minorities or non-white applicants. Kovacs's Declar., RE 30-1, PageID#: 2669. Kovacs and Schroeder spoke about the Tracey Brown Proposal again on October 12, 2020, when Kovacs repeated the same concerns she had already expressed to Schroeder on October 6 about Toth's Tracey Brown proposal. *Id.*

Then on October 20, 2020, Kovacs sent her brand-new supervisor, John Elliott[3], an email in which she wrote the following about the Tracey Brown proposal:

> Moving Tracey to the contract specialist position at this time places the University in a compromising legal position as she does not meet the minimum (basic) qualifications. Promoting an employee that does not meet the minimum qualifications goes against EEO. To keep the process fair and equitable, the OFCCP states to help keep everybody on the same page, carefully craft a job description for the position, not for a person you would like to promote. The OFCCP also states the basic qualifications which an applicant must possess means qualifications that the employer advertised to potential applicants or criteria which the employer established in advance.
>
> To avoid potential disparate impact (disparate impact is often referred to as unintentional discrimination), nonetheless, our practices must be uniformly and consistently applied.
>
> To remain compliant with established minimum qualifications, it would be best to move Tracey into the proposed project assistant role; (changing the title to project specialist), redo the proposed job

---

[3] Elliott had started as the University's Chief Human Officer fifteen days earlier, on October 5, 2020. Elliott Depo., RE 15-1, Page ID# 581-82.

description to align with the contract specialist (and not reading anything like the office assistant 3).

Elliott Depo. RE 15-1, PageID# 707-14.

On or about that same day, Kovacs, Toth, Elliott and Dreyon Wynn spoke about the Tracey Brown Proposal. Kovacs's Depo., RE 14-1, PageID# 264. In this conversation Kovacs repeated the same concerns she had mentioned in the email she had sent to Elliott and in the phone calls she had with Schroeder and Taylor. *Id.* at 265-66.

Elliott, who was aware that Schroeder was advocating in favor of Toth's Tracey Brown proposal, disapproved of Kovacs's objection to moving Tracey Brown to a new position with a higher salary without a job posting and from a union to a non-union position. *Id.* at 261-62; Elliott Depo., RE 15-1, PageID# 647-48. On October 20, 2020, Elliott overrode Kovacs' objections and told Toth to go ahead with moving Tracey Brown without posting the job. Elliott Depo., RE 15-1, PageID# 647-48. The union subsequently filed a grievance relating to Toth's transfer of Tracey Brown and was successful in reversing that move. *Id.* at 658.

**D. <u>Kovacs's demotion and its shifting reasons.</u>**

Seventeen days after the meeting with Toth, Elliott, Wynn and Kovacs, on November 6, 2020, Kovacs attended a meeting with Elliott and Melissa Hurst, the University's new director of talent strategy and development. *Id.* at 589-90; Mellissa Hurst Depo. Transcript, RE 16-1, PageID# 751-52. At this meeting

10

Kovacs learned that she was being demoted. Elliott Depo., RE 15-1, PageID# 590. Kovacs was informed that the reason for her demotion was because the University did not consider her to be "leadership material." *Id.* at 329. Prior to the November 6 meeting, neither Elliott nor Hurst had expressed any concern to Kovacs about her job performance.  Kovacs's Depo., RE 14-1, PageID# 202.

The putative reasons for Kovacs's demotion completely changed eight months later, when the University submitted an affidavit from Hurst to the OCRC in response to the charges Kovacs filed.  Hurst's affidavit does not mention Kovacs's supposed lack of leadership. Hurst Depo., RE 16-1, PageID# 871-72. Instead, Hurst states that Kovacs was demoted for the following reasons:

- Kovacs had not instituted required performance evaluations in 1-2 years
- Kovacs had not instituted any professional development or guidance plans for her team
- Two team members believed they had not been adequately trained by Kovacs
- Kovacs failed to manage two high-level projects – one relating to the University's separation process and the other involving a quarterly personnel action report

*Id.* at 871.  None of these reasons were communicated to Kovacs when she was demoted.

### E. **Several African American HR Directors are terminated between September of 2020 and January of 2021.**

Schroeder and his team were actively engaged in firing African American personnel from the HR department around the same time Kovacs was demoted.

On September 18, 2020, Schroeder terminated Wendy Davis, the University's Chief Human Resource Officer, an African American woman. Postel Depo., RE 20-1, PageID# 136. Two weeks prior to firing Davis, Schroeder had offered Davis's job to white male John Elliott, who started with the University two weeks after Davis's termination. *Id.* Then on October 14, 2020, nine days after Elliott started, Elliott fired the African American Director of HR, Clinical Operations, Carolyn Chapman. Motion for Judicial Notice, RE 21, PageID# 2274-75

On January 26, 2021, Elliott fired Dreyon Wynn, the University's Director of Employee/Labor Relations and HR Compliance, who is also African American. Elliott Depo., RE 15-1, PageID# 597-98. Thus, in four months between September 2020 and January 2021 three African American HR Directors were fired by Matt Schroeder or Schroeder's new hire, John Elliott.[4]

Davis submitted a charge of race discrimination based on her September 2020 termination by Schroeder to the OCRC, and on June 25, 2021, the OCRC issued a letter of determination, finding that it is Probable that [the University] had engaged in an unlawful discriminatory practice on the basis of race in violation of [Ohio law] when it terminated Davis. Postel Depo., RE 20-1, PageID# 1235-37. Wynn also submitted race discrimination charges to the OCRC based on his

---

[4] Not only did Elliott receive his job offer from Schroeder, Schroeder was the only University employee with whom Elliott interviewed. Elliott Depo., RE 15-1, PageID# 581, 585. Therefore, referring to Elliott as Schroeder's new hire is apt.

termination, and in November of 2021 the OCRC found in Wynn's case that there was probable cause of unlawful discrimination by the University. Elliott Depo., RE 15-1, PageID# 596-98, 719-22.

### F. **Kovacs is identified as a comparator by an African American HR employee who notifies the University's President that he plans to bring employment discrimination charges.**

On January 26, 2021, after being fired by Elliott, Wynn emailed and called Dr. Willie McKether, the University's VP of Diversity and Inclusion. Willie McKether Depo., RE 19-1, PageID# 1090, 1105, 1130-31. Wynn informed McKether that the University had recently fired three black HR employees – Davis, Chapman, and Wynn. *Id.* at 1107.   On January 26 and 27, 2021, respectively, Wynn also emailed University President Dr. Gregroy Postel, and University Board member Rebecca Dangler about:

- his termination;
- the potential unlawful race discrimination related to his termination; and
- systemic racism and discriminatory treatment of people of color in the HR Department by Matt Schroeder.

Postel Depo., RE 20-1, PageID# 1226-30.

In the phone conversation Wynn and McKether had on January 26, 2021, Wynn asserted the following to McKether:

- Wynn had already filed charges with the OCRC and planned to file additional charges.
- Schroeder was racist.
- Kovacs, who is white, was demoted but got to keep her job at the same

pay rate.
- Kovacs held a director position similar to Wynn's.
- All the black directors (Wynn, Davis, and Chapman) in the University's HR Department were fired, not demoted.
- Wynn was going to "nail their butts" because the white director was demoted but similarly situated black people were fired.

McKether Depo., RE 19-1, PageID# 1105-07. Right after that phone call, **on January 26 or 27, 2021 McKether spoke to Schroeder about the issues Wynn had raised**. *Id.* at 1099-1100.

Two days later, on January 28, 2021, McKether and Postel met. Postel Depo., RE 20-1, Page ID# 1164-65. Their meeting agenda included the topic of "HR terminations." *Id*. at 1165, 1233. Wynn's termination and the recent HR terminations were discussed at this January 28 meeting and again in another meeting Postel attended soon thereafter. *Id*. at 1165-66. In the January 28 meeting between Postel and McKether, **Postel assured McKether that he would discuss the recent HR terminations with Matt Schroeder**. McKether Depo., RE 19-1, PageID# 1104.  Kovacs's demotion was changed to a termination on February 9, 2021, **twelve days after McKether met with Postel to discuss the HR terminations**.  Postel Depo., RE 20-1, PageID# 1164-66.

### G. Shifting reasons for Kovacs's termination.

Kovacs worked on a variety of tasks for the University after her demotion, including the development of a Standard Operating Policy ("SOP") for employee separations and Personnel Action Reports ("PAR") for the December 2020 and

14

February 2021 University Board of Trustee meetings. Kovacs's Declar., RE 25-1, PageID# 2615-16; Hurst Depo., RE 16-1, PageID# 825-26, 837-39. According to several University HR Department employees, Kovacs's attitude did not change after the demotion, and she remained positive and respectful. Fisher Declar., RE 25-2, PageID# 2617; Reinhart Declar., RE 29, PageID# 2662. Kovacs's post-demotion conduct was considered so positive that on February 3, 2021, the University's HR Department notified the University's CFO that "[g]oing forward Terrie Kovacs will be the Senior HR Consultant" for that department." Elliott Depo., RE 15- 1, PageID# 716.

This announcement notwithstanding, Kovacs was fired by Elliott six days later, which was also fourteen days after Wynn first notified several members of the University's administration (including President Postel) that Kovacs was a white comparator to him, Chapman, and Davis and that people of color in the HR Department had suffered race discrimination at the hands of Schroeder. *Id.* 592-93, 691. Kovacs's termination occurred twelve days after Postel met with the University's VP of Diversity to discuss these HR terminations. Postel Depo., RE 20-1, PageID# 1164- 66.

When Elliott informed Kovacs that she was being fired, she was simply told that the University was "going in a new direction." Kovacs' Depo., RE 14-1, PageID#341.  Five months later, in July 2021, the University changed its tune

about the reason for Kovacs' firing, stating to the OCRC that Kovacs was fired because she "was not engaged in her new role, was not receptive to Jason Beck's new leadership role, and repeatedly told others in the Department that she was not busy," was not making efforts to mentor or transition members and asked to transfer to a labor specialist position. Hurst Depo., RE 16-1, PageID# 872; Elliott Depo., RE 15-1, PageID# 693. In July 2021, the University also attributed Kovacs's termination to her purported statement to another employee that she had ample time and could work part-time on labor relations issues. Elliott Depo., RE 15-1, PageID# 693.

### H. **Elliott and Hurst's testimony regarding Kovacs's job performance is not credible.**

Despite submitting an affidavit about Kovacs' job performance to the OCRC, Elliott testified at his deposition that he had not assessed Kovacs personally, but that Melissa Hurst had. *Id.* at 603. Kovacs began reporting to Hurst, who had just started at the University in early October, in mid-October 2020. Kovacs's Depo. RE 14-1, PageID# 255. At that time, Hurst informed Kovacs and her team that there were "no issues," the team would "remain intact" and they were a "great team" of "high performers." Motion Judicial Notice, RE 22-1, PageID# 1320.

Former University employee Keenen Fisher worked under Kovacs for eleven years. Fisher Declar., RE 25-2, PageID# 2617. Former University

employee Chandra Reinhart worked under Kovacs for over a year. Reinhart Declar., RE 29, PageID# 2662. Kovacs was the direct supervisor of current University employee Kimberly Fahey for approximately four years. Motion Judicial Notice, RE 22-1, Page ID# 1320.

Fisher, Fahey and Reinhart were all surprised when Kovacs was demoted, describing the demotion as "out of left field." *Id*. While Hurst allegedly found Kovacs lacking in leadership after barely a month working with her, both Fahey and Fisher testified that Kovacs was "a strong leader" who received "good reviews about her leadership." *Id*. at 1321; Fisher Declar., RE 25-2, PageID# 2618.

Fisher, Fahey and Reinhart considered Kovacs to be both their supervisor and a mentor. Motion Judicial Notice, RE 22-1, PageID# 1320; Fisher Declar., RE 25-2, PageID# 2618; Reinhart Declar., RE 29, PageID# 2663. According to both Fahey and Fisher, Kovacs assisted them with development plans, and also provided other team members with development plans. Motion Judicial Notice, RE 22-1, PageID# 1320; Fisher Declar., RE 25-2, PageID# 2617-18. According to Reinhart, the testimony of Elliott and Hurst that Kovacs failed to provide her with training is untrue. While Reinhart did inform Hurst that she wanted additional training, she never blamed Kovacs for failing to provide it. Reinhart Declar., RE 29, PageID# 2662.

Hurst's testimony also is directly contradicted by Kovacs. Kovacs not only

had employee development plans, she had also completed employee evaluations. Kovacs's Declar., RE 25-1, PageID# 2614. When Hurst asked Kovacs about the employee evaluations, Kovacs did not fail to answer, as Hurst asserts. *Id.* at 2615. Rather, Kovacs explained that her employee evaluations were late because Kovacs had been out on extended FMLA leave for cancer in 2019 and again in 2020. *Id.*

Kovacs disputes Hurst's contention that she would not attend meetings, was frequently out of the office and requested to work remotely. *Id.* According to Kovacs, she never missed a meeting during the time she worked with Hurst, nor did she ever ask Hurst to work remotely. *Id.* Likewise, Kovacs directly refutes Hurst's claim that she prompted Kovacs on several occasions to complete the University's PAR Report. In fact, since the February PAR Report was not due until after Kovacs's termination, her supposed delay in preparing it could not have been a legitimate reason for firing her. *Id.* at 2616.

The University's complaints about Kovacs's failure to manage this Report are also disingenuous since this responsibility was never taken away from Kovacs. Kovacs, in fact, handled the mid-December 2020 PAR Report after she was demoted and then was in the process of managing the PAR Report for mid-February 2021 when she was fired. Hurst Depo., RE 16-1, PageID# 837- 38.

## I. **Elliott and Hurst owe their University positions solely to Schroeder and Postel.**

Schroeder and Postel both refer in their depositions to an apparent drive in

18

2020 to "modernize" the University's HR Department. One step of this purported HR "modernization" occurred with Schroeder's termination of Wendy Davis on September 18, 2020. Schroeder Depo., RE 17-1, PageID# 929, 944. A few days before firing Davis, Schroeder had hired Elliott to replace her. *Id.* at 925-27. Schroeder had also hired white employee Hurst to be Director of Talent Strategy and Development ten days before he fired Davis. *Id.* at 928.

Neither Elliott nor Hurst interviewed with anyone at the University other than Schroeder and Postel before getting their job offers in early September. Elliott Depo., RE 15-1, PageID# 585; Hurst Depo., RE 16-1, PageID# 754. Elliott and Hurst had both worked with Postel in the recent past; Postel, in fact, sent their resumes to Schroeder and "suggested" their hiring. Postel Depo., RE 20-1, PageID# 1142-43; Hurst Depo., RE 16-1, PageID# 584. Elliott reported directly to Schroeder, and Hurst reported to Elliott. Elliott Depo., RE 15-1, PageID# 582; Hurst Depo., RE 16-1, PageID# 754.  Thus, Elliott and Hurst not only reported to Schroeder, they also owed their University jobs to him.

### J.  Kovacs's OCRC Probable Cause Finding

Attached to the Complaint which commenced this action is a Letter of Determination from the OCRC which determines it is probable that the University engaged in an unlawful discriminatory practice on the basis of retaliation when it demoted and terminated Kovacs (the "Probable Cause Finding").

Kovacs submitted her employment discrimination charge against the University to the OCRC on February 24, 2021. Kovacs' RE 14-1, PageID# 451. Angela Fayne, the assigned OCRC investigator, conducted an extensive investigation of the charges. The OCRC conducted Webex or phone interviews of thirteen witnesses - Kovacs, Toth, Hurst, Jason Beck, Elliott, Kevin West, Bethany Ziviski, Justin Grier, Schroeder, Fisher, Fahey, Davis, and Wynn between September 22 and November 15, 2021. Motion Judicial Notice, RE 22, PageID# 1337-39, 1371-73,1368-70, 1374-76,1353-56, 1383-88, 1389-90, 1357-58, 1316-17, 1391-94, 1318-19, 1320-21, 1396-98, 1407-08. The University's counsel participated in the OCRC interviews of half these witnesses[5] – Toth, Hurst, Beck, Elliott, Schroeder and Ziviski, and submitted a lengthy Position Statement. *Id.* at 1302-15. The OCRC also reviewed hundreds of documents during its investigation. *Id*. at 1719-2075.

The OCRC investigation concluded 8-1/2 months after it was filed, on November 18, 2021, with the issuance of the Probable Cause Finding. Complaint, RE 1-6, PageID# 31-36.[6] Among the other findings in its determination, the OCRC

---

[5] Notably, Kovacs was not represented by counsel during the OCRC process.

[6] Part of the reason Kovacs' charge was pending for 8-1/2 months was that the University requested and was granted several extensions of time to submit its position statement to the OCRC. Motion Judicial Notice, RE 22-1, PageID# 1327-28.

found that "[h]ad it not been for [Kovac's] race it would not have been necessary for [the University] to [terminate] her." *Id.* at 33.

### K. Failure to consider OCRC Probable Cause Finding

The Probable Cause Finding was never excluded by the District Court. The University did not argue in its MSJ or Reply in Support of the MSJ that the Probable Cause Finding was not trustworthy and should be excluded. In fact, the University never references the Probable Cause Finding in either filing. MSJ, RE 18; Reply in Support of MSJ, RE 33. The Probable Cause Finding was cited to throughout Kovacs' brief in opposition to the MSJ. Brief in Opp. to MSJ, RE 31, PageID#: 2698, 2702-03, 2709-12, 2716. However, the Court's January 10, 2024 ruling on the MSJ makes no mention of it.

On October 5, 2023, the District Court did enter an order declining to take judicial notice of the investigation file relating to Kovacs's OCRC charge. Order, RE 32, PageID# 2723-24. At that time the District Court stated "to the extent that [Kovacs] seeks to admit and use the witness summaries contained in the OCRC investigation file for their truth, I deny [Kovacs]'s Motion." *Id.* at 2724. This ruling does not, however, hold that the OCRC Probable Cause Finding is inadmissible. Rather, the Court's October 5, 2023 ruling declining to take judicial notice was limited to OCRC witness summaries. *Id.*

### L. Kovacs's request for reconsideration.

Kovacs moved for reconsideration of the January 10, 2024 ruling on grounds that the Probable Cause Finding should have been considered. Motion for Reconsideration, RE 36. On June 20, 2024, the trial court denied this request, again declining to factor the Probable Cause Finding into its analysis of the MSJ. Amended Order, RE 40.

The trial court's reasoning in its June 20 ruling was that the Probable Cause Finding is "largely hearsay" and presented "similar trustworthiness" problems to the OCRC letter of determination at issue in *Alexander v. CareSource,* 576 F.3d 551, 561 (6th Cir. 2009). *Id.* at 2804. In making this determination the trial court did not mention any of the four factors used to determine trustworthiness from *Alexander* - the timeliness of the OCRC investigation, the special skill or experience of the OCRC investigators, whether the OCRC held a hearing and any possible motivational problems. *Id.* Rather, the trustworthiness problem identified by the District Court was that the OCRC blended its analysis of race discrimination with its analysis of retaliation and, due to this "conflation" of the two different theories is "likely to be confusing and unhelpful to a factfinder." *Id.* at 2806.

### M. Relevance of OCRC Probable Cause Finding.

In its summary judgment ruling, the trial court granted the MSJ with respect to Kovacs's termination on grounds that Kovacs did not establish a causal connection between the protected activity and her termination. Opinion on MSJ, RE 34,

PageID# 2767.   The lower court found that Kovacs had established the other elements of a prima facie case.  *Id.*

On the causation element, the District Court found that the "nearly four-month delay" between Kovacs' protected activity and her termination was too long for temporal proximity alone to suffice to establish a causal connection and that the delay required that Kovacs provide additional evidence of this connection.[7]  *Id.*  The court then stated that Kovacs did not provide additional evidence of a causal connection and proffered "only suppositions and speculation about [Matthew] Schroeder, [Dreyon] Wynn, [Gregory] Postel and others."  *Id.*  The court also stated that Kovacs did not establish that any of these individuals had anything to do with the decision to fire her.  *Id.*

This aspect of the court's ruling contradicts the Probable Cause Finding.  Of relevance to the causal connection element of Kovacs' termination are the following from the Probable Cause Finding by the OCRC:

- The University's employee Dreyon Wynn, who is African American, contacted the University's Vice President of Diversity, Dr. Willie McKether, about the Kovacs' demotion on January 26, 2021, and expressed concern to McKether that the Kovacs was not served with a separation notice, unlike three African Americans who also held leadership positions in the University's HR Department, but were terminated.  RE 1-6, PageID#: 33.  In this conversation Wynn told

---

[7] The Court's finding in this regard is objectionable as the delay is actually 3-1/2 months or 111 days – from October 20, 2020 to February 9, 2021.  Opinion, RE 34, PageID# 2747-49.

McKether that Wynn would use Kovacs as a comparator to the three African Americans who had been terminated. *Id.*

- Kovacs was terminated exactly two weeks after this conversation. *Id.*

- When the Kovacs was terminated, she had only been in the position to which she had been demoted for 70 days. *Id.* Moreover, Kovacs's supervisor, Jason Beck, had only been supervising her for 36 days when she was fired. *Id.*

- After her demotion Kovacs was not assigned to an area or given many job duties. *Id.*

- Kovacs was terminated despite an absence of any performance issues or any documented discipline. *Id.*

- Despite having worked for the University for 18 years, Kovacs was not given an opportunity to correct any alleged performance issues before she was fired. *Id.* at 31, 33.

- "Had it not been for [Kovac's] race it would not have been necessary for [the University] to [terminate] her." *Id.*

Brief in Opp. to MSJ, RE 31, PageID# 2698-99, 2711, 2774-75.

Essentially what the OCRC found was that the University changed Kovacs's demotion for protected activity to a termination fourteen days after an African American employee in the University's HR department exposed disparate treatment between white and black HR employees. *Id.* Kovacs' unlawful demotion became a termination as part of an effort by the University to avoid race discrimination charges.

**N. Additional Evidence of Causal Connection.**

24

The District Court was presented with other evidence to show that Kovacs's retaliatory demotion was flipped to a retaliatory termination because the University had been threatened with race discrimination charges. Both Postel (University President) and Elliott (University Chief HR Officer) knew that Dreyon Wynn had raised legal issues regarding Kovacs's demotion to several university employees and to the OCRC. Postel Depo., RE 20-1, PageID# 1165, 1233; Elliott Depo., RE 15-1, PageID# 628-29. Elliott testified that he knew sometime after January 26, 2021, that McKether had shared concerns about the HR terminations of African American employees with Postel and Schroeder. Elliott Depo., RE 15-1, PageID# 622-23. And Postel testified that he made sure that the University's Office of Legal Affairs knew about McKether's concerns. Postel Depo., RE 20-1, PageID# 1152.

While it is accurate that Schroeder (who oversaw HR and was Elliott's direct report) testified that he did not recall when asked if Kovacs was fired because a terminated African American employee had alleged that she was going to be used as a comparator, this testimony is suspect. Schroeder Depo., RE 17-1, PageID# 988. Schroeder's purported lack of recollection is not credible as four other University employees - Elliott, Postel, McKether and Wynn - all recall these issues being raised by Wynn and conversations about it, as well as Schoeder's involvement. Schroeder's testimony also lacks credibility in light of other testimony that Schroeder was "very

dialed into every area of his responsibility." Elliott Depo., RE 15-1, PageID# 642, 647-48.

## STANDARD OF REVIEW

A district court's grant of summary judgment is reviewed de novo, drawing all reasonable inferences in favor of the non-moving party. *Sandman v. New York Times Company*, 78 F.4th 319, 328 (6th Cir. 2023) (citation omitted).

In ruling on a motion for summary judgment, a judge's function is not to weigh the evidence, and determine the truth but to determine whether there is a genuine issue for trial. *Jones v. Fluor Facility & Plant Services*, No. 24-5249, 2025 WL 707869, *5 (6th Cir. Mar. 5, 2025) (quoting *George v. Youngstown State Univ.*, 966 F.3d 446, 462 (6th Cir. 2020)). "'Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge,' when ruling on a motion for summary judgment." *Helphenstine v. Lewis County, Kentucky*, 60 F.4th 305, 314 (6th Cir. 2023) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). Evidence is to be viewed in the light most favorable to the nonmoving party, which means that "any direct evidence offered by the [nonmovant] in response to a summary judgment motion must be accepted as true." *Muhammad v. Close*, 379 F.3d 413, 416 (6th Cir. 2004). Weighing evidence at this stage is prohibited. *Hostettler v. College of Wooster*, 895 F.3d 844, 852 (6th Cir. 2018).

The ultimate question on a motion for summary judgment is "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Martin v. Saginaw County Road Comm'n*, 606 F.Supp.3d 639, 649 (E.D. Mich. 2022) (quoting *Anderson*, 477 U.S. at 251-252). As long as a reasonable jury could credit the nonmoving party's evidence, summary judgment is improper. *George*, 966 F.3d at 462. *See also Jones*, 2024 WL at *5.

In the context of a request for summary judgment in an employment discrimination case, when a plaintiff has made a prima facie case on an employment discrimination claim, courts must exercise caution in granting summary judgment because "'an employer's true motivations are particularly difficult to ascertain, thereby frequently making such factual determinations unsuitable for disposition at the summary judgment stage.'" *Willard v. Huntington Ford, Inc.*, 952 F.3d 795, 810 (6th Cir. 2020) (quoting *Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 55, 546 (6th Cir. 2004)) (emphasis added).

## **ARGUMENT**

To establish a prima facie case of Title VII retaliation, Kovacs must show that: (1) she engaged in activity protected by Title VII; (2) her exercise of such protected activity was known by the University; (3) thereafter, the University took an action that was 'materially adverse' to her; and (4) a causal connection existed between the

protected activity and the materially adverse action. *George*, 966 F.3d at 459 (quoting *Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014)). *See also Ames v. Ohio Dep't of Youth Services*, 87 F.4th 822, 824 (6th Cir. 2023).[8]

The lower court found that Kovacs established three of these four elements on her termination claim, but that she did not establish a prima facie case because she did not produce sufficient evidence of the fourth element - causal connection from which an inference could be drawn that the University would not have terminated her if she had not engaged in protected activity. Opinion, RE 34, PageID# 2761. Specifically, the District Court found that the "nearly four-month" delay between the protected activity and the termination was too long for temporal proximity alone to establish causal connection, and Kovacs's additional evidence of causal connection was not sufficient. *Id.* at 2762. The District Court also found in favor of Kovacs on the question of pretext. *Id.* at 2766.

When asked to consider the Probable Cause Finding, the District Court declined to do so because it found it to be "largely hearsay." Order, RE 40, PageID#: 2804. The District Court also rejected the Probable Cause Finding because 1) it implied that the temporal proximity between Wynn and McKether's January 26, 2021 call and Kovacs' February 9, 2021 firing established the causal connection;

---

[8] *Ames* is a Title VII sex discrimination case which is currently on appeal to the U.S. Supreme Court, Case No. 23-1039. *Ames* has been fully briefed, and oral argument occurred on February 26, 2025. A decision is expected later this year.

and 2) the OCRC conflated race and retaliation discrimination in a way that "is likely to be confusing and unhelpful to a fact finder. *Id.* at 2805.

### A. Ohio's employment discrimination law procedures make the Probable Cause Finding significant.

On April 15, 2021, the Employment Law Uniformity Act ("ELUA") became effective in Ohio. *See Burch v. Ohio Farmers Ins. Co.*, 2023-Ohio-912, 211 N.E.3d 202, 203-04, ¶3 (5th Dist.). The ELUA made significant changes to Ohio's laws governing workplace discrimination claims; among the changes is a requirement that employees alleging workplace discrimination exhaust the remedies available to them through the Ohio Civil Rights Commission prior to filing a claim in court. *See Blank v. Nationwide Mutual Insurance Co.*, 2024-Ohio-2500, 247 N.E.d.3d 555, ¶19 n.6 (10th Dist.). Before April of 2021, the filing of an administrative agency charge prior to going to court was optional.

The OCRC, which has the responsibility of enforcing Ohio's laws against discrimination, was established in 1959. O.R.C. § 4112.05. The OCRC's powers and duties are to receive, investigate, render formal determinations and conciliate charges of unlawful discrimination in the areas of employment, housing, public accommodations and disability in higher education. O.R.C §§ 4112.04 and 4112.051. Probable Cause findings are issued by the OCRC only if a full investigation reveals that there is sufficient evidence to conclude it is probable that a discriminatory act in violation of Ohio law occurred. O.R.C. § 4112.051. OCRC

investigators are trained and sensitive to discrimination issues in discrimination cases. *See Elek v. Huntington Natl Bank*, 60 Ohio St.3d 135, 140. 573 N.E.2d 1056, 1061, n.4 (1991) (citation omitted) (Moyer, J. dissenting).

> Due to their reservoir of experience, the OCRC's hearing officers are astute at screening out irrelevant and less than credible evidence and weighing the remaining evidence in light of the issues to make their determinations. The OCRC is uniquely capable of addressing the peculiar problems inherent to civil rights claims because of its informal methods of persuasion and conciliation that are not a formal part of the judicial system.

*Id*. (quotation omitted).

**B.     F.R.E 803(8) required that the Probable Cause Finding be considered by the trial court.**

Federal Rule of Evidence ("F.R.E.") 803(8) considers reports of government agencies to be **<u>non-hearsay</u>** and admissible unless "the sources of information or other circumstances indicate lack of trustworthiness." *Alexander v. Caresource, Inc.,* 576 F.3d 551, 561 (6th Cir. 2009) (quoting F.R.E. 803(8)) (emphasis added). In the Sixth Circuit, OCRC probable cause findings are considered to be reports of government agencies and therefore are "admissible non-hearsay" unless a court finds that the probable cause finding lacks trustworthiness. *Alexander*, 576 F.3d at 563. The burden of establishing a lack of trustworthiness is on the opponent of the government report. *Harmon v. Honeywell Intelligrated*, 2024 WL 4117026, *3 (6th Cir. Aug. 15, 2024) (quoting F.R.E. 803(8)); *Simpkins v. Boyd County Fiscal Court*, 2022 WL 14446819, *10 (6th Cir. 2022)).

To determine whether a government report, such as an OCRC finding, is untrustworthy, courts consider the following non-exclusive factors:

1)  The timeliness of the investigation upon which the report is based;

2)  The special skill or experience of the investigators;

3)  Whether the agency held a hearing; and

4)  Possible motivational problems.

*Alexander,* 576 F.3d at 563 (quoting *Chavez v. Carranza*, 559 F.3d 486, 496 (6th Cir. 2009) (additional citations omitted)).  Courts may also consider any other circumstances which could affect the trustworthiness of the underlying information. *Alexander*, 576 F.3d at 563 (emphasis added) (quotation omitted).

There are occasions when an OCRC probable cause finding can be excluded in ruling on a dispositive motion, but "**only** if the court 'finds that the sources of information or other circumstances indicate lack of trustworthiness.'"  *Id.* at 563 (quoting Fed.R.Evid. 803(8)); *see also* 2 McCormick on Evid. § 296 (6th ed.)) (emphasis added); *Rembert v. Swagelok Co.*, 604 F.Supp.3d 670, 686 (N.D. Ohio 2022) (citations omitted), *rev'd on other grounds* 2023 WL 3094546 (6th Cir. 2023).

Although an OCRC finding of probable cause of discrimination is not dispositive, such a finding "should receive 'substantial weight.'"  *Kimble v. Wasylyshyn*, 439 Fed.Appx. 492, 500 (6th Cir. 2011) (quoting *Wrenn v. Gould*, 808 F.2d 493, 499 (6th Cir. 1987).  An OCRC probable cause determination is to be

treated as "an additional piece of circumstantial evidence." *Kimble,* 439 Fed.Appx. at 500.

The District Court's failure to consider the Probable Cause Finding at all in ruling on the MSJ is reversible error for several reasons.

**1. The Probable Cause Finding is not largely hearsay.**

In ruling on Kovacs' Motion for Reconsideration the trial court declined to consider the OCRC Probable Cause Finding on grounds it is largely hearsay because it "contains multiple layers of statements, […] and each statement must conform with an exception to the hearsay rule." Order, RE 40, PageID# 2804. This statement, however, shows a fundamental misunderstanding of F.R.E 803(8), which specifically states that records or statements of public offices are **<u>not excluded</u>** by the rule against hearsay unless the statement is untrustworthy. *Alexander*, 576 F.3d at 561. Thus, excluding the Probable Cause Finding on grounds that it is "largely hearsay" directly violates F.R.E. 803(8).

**2. The University did not and cannot show that the Probable Cause Finding is untrustworthy.**

There was nothing presented to the trial court by the University to suggest that the Probable Cause Finding was not trustworthy. *Simpkins*, 2022 WL at *10. As the University has the burden on this issue, the lower court erred by failing to consider the Probable Cause Finding on the MSJ and again on Kovacs's request for reconsideration.

### a. The University failed to demonstrate that the investigation on which the Probable Cause Finding was based was not timely.

Kovacs submitted her charge to the OCRC on February 24, 2021, two weeks after the University fired her, and the OCRC issued its determination on November 18, 2021. Considering that the OCRC interviewed thirteen witnesses and reviewed hundreds of documents in this 8-1/2 month time frame, the University did not and cannot establish that the investigation was not timely. Therefore, any determination that the Probable Cause Finding was not timely would be in error.

### b. The University did not establish that the investigator lacked special skill or experience.

OCRC investigators are specially trained to handle discrimination cases. *Elek*, 60 Ohio St.3d at 140. Further, the University never presented evidence to the District Court that OCRC investigator Fayne did not have the requisite skill or experience to investigate Kovacs' charges. The University, therefore, did not and cannot show that the OCRC investigator lacked special skill or experience.

### c. The University did not establish that the OCRC did not hold a hearing.

The OCRC conducted thirteen witness interviews via Webex or phone and accepted lengthy written position statements from the University and Kovacs. It also reviewed hundreds of documents. The District Court actually considered less evidence than the OCRC, as the trial court did not assess the testimony of a single witness.

The University did not and cannot show that the lack of a hearing before the OCRC renders the Probable Cause Finding untrustworthy.

### d. The University did not establish that the OCRC had motivational problems.

The University did not allege motivational problems.  Even if the University had made this argument, it would have been impossible to establish such problems with the OCRC.  In fiscal year 2022, the most recent year this information was provided, only 3.71%, or 152, of the 4,091 cases filed with the OCRC resulted in a finding of probable cause.[9]

Accordingly, the lower court had no evidence to find that the OCRC had motivational problems in favor of the University in this regard.

### 3. Confusion to the jury is not relevant in ruling on a motion for summary judgment.

The District Court also rejected the Probable Cause Finding because it "blends" its analysis of race and retaliation discrimination and, therefore, is likely to be too "confusing" to a factfinder.  Order, RE 40, PageID#: 2805.  While the lower court does not reference F.R.E. 403 in its ruling, this statement appears to be made pursuant to that Rule, which provides for the exclusion of relevant evidence "if its probative value is substantially outweighed by a danger of confusing the issues."

---

[9] https://dam.assets.ohio.gov/image/upload/civ.ohio.gov/Annual%20Reports/Annual%20Report%202022.pdf

34

However, F.R.E. 403 permits the exclusion of relevant evidence only after a trial court conducts a balancing test weighing its probative value against confusing the jury.  The balancing process contemplated by F.R.E. 403 is to be undertaken at trial, not on summary judgment.  *Matthew v. Waukesha County*, 937 F.Supp.2d 975, 982 (E.D. Wis. 2013) (citing *Adams v. Ameritech Servs., Inc.*, 237 F.3d 414, 428 (7th Cir. 2000)).  This is because, in ruling on a motion for summary judgment, the reasons to exclude evidence under F.R.E. 403 are not present, as a trial court is "perfectly capable of considering evidence without the countervailing concerns," such as confusing the issues, set forth in 403.  *United States Fire Ins. Co. v. City of Warren*, No 10-cv-13128, 2012 WL 13006156, *4 (E.D. Mich. June 12, 2012).  *See also In re Chiquita Brands Int'l, Inc. v. Allen Torts Statute and Shareholder Derivative Litigation*, Case No. 08-MD-01916, 2022 WL 18957608, *23, n.39 (S.D. Fl. Dec. 14, 2022) (citations omitted); *Stewart v. Harlan City Police Dep't*, No. 6:13-66-DCR, 2014 WL 5364809, *5 (E.D. Ky. Oct. 21, 2014).

Disregarding the Probable Cause Finding because it might be confusing to the fact finder was reversible error by the trial court.

**C.    If the District Court had considered the Probable Cause Finding it would have found that Kovacs established a prima facie case of a causal connection between the protected activity and her termination.**

A plaintiff's burden is not onerous at the prima facie stage.  *George*, 966 F.3d at 460.  At summary judgment, a plaintiff is simply required to "put forth **some**

**credible evidence** that enables the Court to deduce that there is a causal connection between the retaliatory action and the protected activity." *Kirilenko-Ison v. Bd. Of Educ. Of Danville Independent Schools*, 974 F.3d 652, 666 (6th Cir. 2020) (citations omitted).

Causation, "'which necessarily involves an inquiry into the motives of an employer, is highly context-specific.'" *Kenney v. Aspen Technologies, Inc.*, 965 F.3d 443, 448 (6th Cir. 2020) (quotation omitted). For example, seven months between the protected activity and the adverse action has been held to be sufficient to infer causation when there is other circumstantial evidence. *O'Neill v. Scripps Media, Inc.*, Case No. 1:23-cv-410, 2024 WL 836955, *11 (S.D. Ohio Feb. 28, 2024).

When the Probable Cause Finding in favor of Kovacs is considered, there is credible evidence of a causal connection between Kovacs's October 2020 protected activity and her termination:

- University employee Wynn, who is African American, contacted the University's Vice President of Diversity, Dr. McKether, about the Kovacs' demotion on January 26, 2021, and expressed concern that Kovacs was not served with a separation notice, unlike three African Americans who also held leadership positions in the University's HR Department, but were terminated. Complaint, RE 1-6, PageID# 33. In this conversation Wynn told McKether that Wynn would use Kovacs as a comparator to the three terminated African Americans. *Id.*

- Kovacs was terminated exactly two weeks after this conversation. *Id.*

- When the Kovacs was terminated, she had only been in the position to which she had been demoted for 70 days. *Id.* Moreover, Kovacs's

supervisor, Jason Beck, had only been supervising her for 36 days when she was fired.  *Id.*

- After her demotion, Kovacs was not assigned to an area or given many job duties.  *Id.*

- Kovac was terminated despite an absence of any performance issues or any documented discipline.  *Id.*

- Despite having worked for the University for 18 years, Kovacs was not given an opportunity to correct any alleged performance issues before she was fired.  *Id.* at 31, 33.

- "Had it not been for [Kovac's] race it would not have been necessary for [the University] to [terminate] her."  *Id.*

Brief in Opp. to MSJ, RE 31, PageID# 2698-99, 2711, 2774-75.

### D.    Kovacs presented other circumstantial evidence of a causal connection.

The District Court also erred in finding that Kovacs presented no other evidence of a causal connection or to support that the person who fired Kovacs, Elliott, and Beck knew about Wynn's complaints.  Opinion, ECF#34, PageID# 2764. However, at several points in Kovacs' brief in opposition to the MSJ, she points out that Elliott's boss, Matt Schroeder, was aware of the accusations made by Wynn about Kovacs:

- On January 26 or 27, 2021, McKether spoke to Schroeder about Wynn's allegations that Kovacs was demoted by Elliott while the African American HR employees were fired.  Brief in Opp. to MSJ, RE 31, PageID# 2699.

- At a January 28, 2021 meeting between McKether and [University President] Postel, Postel assured McKether that he would discuss the issues about the HR terminations and demotion with Schroeder. *Id.*

- As Schroeder was "very dialed in" to the HR Department (Shroeder had recently fired Davis and hired Elliott and Hurst without involving anyone else), it is impossible to believe that Schroeder did not communicate with Elliott about the three firings of African American HR Directors after Wynn complained.[10]

Kovacs also established that Schroeder was responsible for the recent firing of Kovacs' boss, Wendy Davis, and the hiring of Kovacs' new bosses, Elliott and Hurst, and that Elliott reported directly to Schroeder. Moreover, Schroeder had been integrally involved in the HR process of the Tracey Brown Proposal, which involved a single lower level University employee. While it is accurate that Schroeder did not fire Kovacs, there is plenty of circumstantial evidence to show that Schroeder knew about Wynn's complaints and that he communicated Wynn's disparate treatment concerns to Elliott.

### E.    Kovacs did not waive the argument regarding causal connection.

In its ruling on Kovacs's motion for reconsideration, the lower court stated that it was too late for Kovacs to raise her argument as to why the Probable Cause Finding should be evaluated as a causation factor in establishing a prima facie case

---

[10] Elliott also was aware of the concerns raised about the terminations of only African American HR employees. Elliott Depo., RE 15-1, PageID# 628-30. While this fact is not in the Brief in Opposition to the MSJ, it is in the Plaintiff's Motion for Reconsideration. Motion for Recons., RE 36, PageID# 2775.

for retaliation. Order, RE 40, PageID# 2802 n.3. According to the trial court, Kovacs did not make this argument in her response to the MSJ and that it was too late to do so in her motion for reconsideration. *Id.*

This statement, however, not only ignores that Kovacs attached and cites to the Probable Cause Finding in her Complaint, it is also referred to throughout Kovacs' brief in opposition to the MSJ. Brief in Opp. to MSJ, RE 31, PageID# 2698-2700, 2710-12.

Moreover, based on well-established federal law interpreting F.R.E. 803(8), Kovacs expected that the District Court would consider the Probable Cause Finding in its summary judgment analysis. It was **only after** the court issued its ruling on January 10, 2024, that Kovacs learned that the Probable Cause Finding had been ignored completely. Thus, the District Court ruled that Kovacs waived an argument she was not even required to raise as the University had the burden of proof on this question. The District Court's statement in this regard is reversible error.

### F.    The District Court's disregard for the Probable Cause Finding is wasteful.

Beginning in April of 2021, every employment discrimination lawsuit filed in Ohio must first go through either the OCRC or EEOC process. O.R.C. § 4112.052. The trial court's decision to disregard the results of the long-established OCRC process without requiring the opponent of the OCRC evidence to establish that the

OCRC Probable Cause Finding is not trustworthy is a massive waste of government resources.

This misuse is especially egregious in the case at hand, where there is no way the University can establish that the Probable Cause Finding is untrustworthy. Deeming its untrustworthy is improper because the University was represented by counsel throughout the OCRC investigation and submitted a lengthy position statement, an experienced OCRC investigator interviewed more than a dozen witnesses, and hundreds of pages of documents from the parties were reviewed.

More efficient use of resources is part of the reason other federal circuits hold that EEOC investigative reports and determinations are per se admissible pursuant to F.R.E. 803(6). *See Plummer v. Western Intern. Hotels,* 656 F.2d 502, 505 (9th Cir. 1981); *Smith v. Universal Services, Inc.*, 454 F.2d 154, 157 (5th Cir. 1972). These courts note that the reports are prepared by professional investigators on behalf of an impartial agency and failing to consider them is inefficient. *Lopez v. Kempthorne*, 684 F.Supp.2d 827, 888-89 (S.D. Tex. 2010); *Coleman v. Home Depot, Inc.*, 306 F.3d 1333, 1344 (3rd Cir. 2002) (citation omitted). "To ignore the manpower and resources expended on the EEOC investigation and the expertise acquired by its filed investigators in the area of discriminatory employment practices [is] wasteful and unnecessary." *Walia v. Potter,* No. C09-1199JLR, 2012 WL 12977878, *1 (W.D.

Wash. 2012) (quoting *Bradshaw v. Zoological Soc. Of San Diego*, 569 F.2d 1066, 1069 (9th Cir. 1978)).

The District Court's failure to even consider the Probable Cause Finding is wasteful and permits a documentary review to take precedence over thirteen witness interviews conducted by an experienced OCRC investigator.

### G.    The District Court applied an inflexible and improper standard.

The appropriate standard in a Title VII employment discrimination case in which summary judgment has been sought is whether a plaintiff has sufficient evidence to permit a reasonable jury to find the existence of an unlawful motive. *Tynes v. Forida Dep't of Juvenile Justice*, 88 F.4th 939, 941 (11th Cr. 2023); *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). Summary judgment for a defendant is not appropriate if a plaintiff presents circumstantial evidence that creates a triable issue regarding the employer's discriminatory intent. *Tynes*, 88 F.4th at 946 (citation omitted). The legal standard is:

> simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action. Evidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself—or whether just the "direct" evidence does so, or the "indirect" evidence.

*Ortiz*, 834 F.3d at 765.

The very presence of the Probable Cause Finding establishes that a reasonable jury could find that Kovacs was terminated unlawfully. Accordingly, summary judgment in favor of the University was improper and should be reversed.

## CONCLUSION

The sole reason the trial court entered summary judgment against Kovacs on her termination claim was that the 3-1/2 month gap between her protected activity and her termination was too long on its own to establish a causal connection and Kovacs did not present sufficient additional evidence of that connection. Opinion, RE 34, PageID# 2767. In issuing this ruling, the District Court failed to consider the Probable Cause Finding, which found, after interviewing thirteen (13) witnesses, a causal connection between Kovacs's protected activity and termination. The lower court also ignored circumstantial evidence showing that Kovacs's employment with the University was on track to continue, but instead was derailed exactly two weeks after numerous University officials (including Postel, McKether and Dengler) were notified that Dreyon Wynn planned to use Kovacs's demotion as a basis to sue the University.

In response to a motion for summary judgment, a plaintiff in an unlawful retaliation case is only required to present "some credible evidence … of a causal connection between the retaliatory action and the protected activity." *Kirilenko-Ison*, 974 F.3d at 666 (citations omitted). When the Probable Cause Finding and

other circumstantial evidence is considered, there is credible evidence of this connection:  Kovacs' retaliatory demotion was subsequently changed to a termination due to the color of her skin.  Complaint, RE 1-6, PageID# 33.

Kovacs is not arguing that the OCRC Probable Cause ruling entitles her to a verdict in her favor.  Rather she is arguing that the Probable Cause ruling entitles her to a trial and the opportunity to present her case to a jury.

The District Court rulings should be reversed.

Respectfully submitted,

*/s/ Ellen M. Kramer*
Ellen M. Kramer (0055552)
emk@crklaw.com
Joshua R. Cohen (0032368)
jcohen@crklaw.com
Cohen Rosental + Kramer LLP
3208 Clinton Avenue
One Clinton Place
Cleveland, Ohio 44113
Phone: (216) 815-9500
Fax: (216) 781-8061

*Counsel for Appellant*

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned counsel for Appellant certifies that the foregoing **Brief of Appellant Theresa A. Kovacs** complies with the type-volume of Fed.R.App.P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed.R.App.P. 32(f), according to the word count functions of Microsoft Word 365, the word-processing system used to prepare this brief, there are 9,826 words, including footnotes, in this Brief.

The undersigned counsel for Appellant also certifies that the foregoing Brief of Appellant Theresa A. Kovacs complies with the typeface requirements of Fed.R.App.P. 32(a)(5) and the type-style requirements of Fed.R.App.P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Times New Roman in 14-point.

## **CERTIFICATE OF SERVICE**

I certify that on this 17th day of March 2025, a copy of the foregoing **Brief of Appellant Theresa A. Kovacs** was filed electronically.  Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt.  Parties may access this filing through the Court's system.

/s/ Ellen M. Kramer_____
Ellen M. Kramer (0055552)

# ADDENDUM

| Record Entry Number | Record Item Description | Date Filed | Page ID Range |
|---|---|---|---|
| 1 | Complaint | 11/30/2022 | 1-61 |
| 1-6 | Complaint Exhibit - Letter of Determination | 11/30/2022 | 31-36 |
| 14-1 | Deposition Transcript of Theresa A. Kovacs | 8/8/2023 | 122-570 |
| 15-1 | Deposition Transcript of John Elliott | 8/8/2023 | 573-741 |
| 16-1 | Deposition Transcript of Melissa Hurst | 8/8/2023 | 744-901 |
| 17-1 | Deposition Transcript of Matthew Schroeder | 8/8/2023 | 904-1039 |
| 18 | Motion for Summary Judgment of Defendant University of Toledo | 8/14/2023 | 1040-1075 |
| 19-1 | Deposition Transcript of Willie McKether | 8/15/2023 | 1084-1131 |
| 20-1 | Deposition Transcript of Gregory Postel MD | 8/16/2023 | 1134-1268 |
| 21 | Motion for Judicial Notice (Fed.R.Evid. 201) | 8/17/2023 | 1269-1272 |
| 22 | Motion for Judicial Notice (Fed.R.Evid. 201) | 8/31/2023 | 1299-1301 |
| 22-1 | Correspondence to Angela Fayne from Michael C. Griffaton | 8/31/2023 | 1302-1538 |
| 25-1 | Declaration of Theresa A. Kovacs | 9/11/2023 | 2613-2616 |
| 25-2 | Declaration of Keenen Fisher | 9/11/2023 | 2617-2618 |
| 29 | Declaration of Chandra Reinhart | 10/3/2023 | 2662-2663 |
| 30-1 | Declaration of Theresa A. Kovacs Attachment | 10/3/2023 | 2667-2686 |
| 31 | Plaintiff's Amended Brief in Opposition to Defendant's Motion for Summary Judgment | 10/3/2023 | 2687-2718 |
| 32 | Order | 10/5/2023 | 2719-2724 |
| 33 | Defendant's Reply in Support of Its Motion for Summary Judgment | 10/17/2023 | 2725-2744 |

| 34 | Order on Motion for Summary Judgment | 1/10/2024 | 2745-2767 |
| 36 | Motion for Partial Reconsideration | 2/14/2024 | 2770-2778 |
| 40 | Amended Order | 6/20/2024 | 2799-2806 |
| 64 | Judgment | 1/21/2025 | 2941-2943 |
| 65 | Plaintiff's Notice of Appeal | 1/21/2025 | 2944-2974 |