Case No. 25-3035

————————————————————

**IN THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

————————————————————

**THERESA A. KOVACS**

Plaintiff-Appellant

v.

**UNIVERSITY OF TOLEDO**

Defendant-Appellee

————————————————————

On Appeal from the United States District Court
for the Northern District of Ohio
Case No. 3:22-cv-02151-JGC

————————————————————

**BRIEF OF APPELLEE UNIVERSITY OF TOLEDO**

————————————————————

Dated:    April 16, 2025

**DAVE YOST
Attorney General of Ohio**

Drew C. Piersall, *Counsel of Record*
LITTLER MENDELSON, P.C.
41 South High Street, Suite 3250
Columbus, OH  43215
Telephone:  614.463.4251
Facsimile:  380.210.1815
Email:      dpiersall@littler.com

*Counsel for Appellee University of Toledo*

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

**THERESA A. KOVACS**          :
                                :

          Plaintiff–Appellant      :
                                :

      v.                       :     Case No. 25-3035
                                :

**UNIVERSITY OF TOLEDO**     :
                                :

          Defendant–Appellee     :

## DISCLOSURE OF CORPORATE AFFILIATIONS
## AND FINANCIAL INTERESTS

Pursuant to Sixth Circuit Rule 26.1, Defendant-Appellee University of Toledo makes the following disclosures:

**I.**    Is said party a subsidiary or affiliate of a publicly owned corporation?

<u>ANSWER</u>:  No.

If the answer is Yes, list below the identity of the parent, subsidiary or other affiliate corporation and the relationship between it and the named party:

<u>N/A</u>

**II.**    Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?

ANSWER:  No.

If the answer is Yes, list the identity of such corporation and the nature of the financial interest:

N/A

/s/ Drew C. Piersall                          April 16, 2025
Drew C. Piersall                               Date

# TABLE OF CONTENTS

**Page**

DISCLOSURE OF CORPORATE AFFILIATIONS AND
FINANCIAL INTERESTS...................................................................... i

TABLE OF CONTENTS ..................................................................... iii

TABLE OF AUTHORITIES.................................................................v

STATEMENT REGARDING ORAL ARGUMENT.................................x

I.    JURISDICTIONAL STATEMENT .................................................1

II.   STATEMENT OF THE ISSUES .....................................................2

III.  INTRODUCTION .........................................................................3

IV.   STATEMENT OF THE CASE ........................................................6

      A.    Appellant's Employment History........................................7

      B.    HR Modernization Is Identified As An Initiative By UT
            President Postel ...............................................................9

      C.    Kovacs Is Demoted .........................................................11

      D.    Kovacs Fails To Connect The Dots Of Her Conspiracy Theory.........13

      E.    Kovacs Is Terminated......................................................14

      F.    Kovacs' Repeated Attempts To Introduce Her OCRC Probable
            Cause Finding Are Denied ...............................................16

      G.    Lawsuits Brought By African American UT Human Resources
            Employees Fail.................................................................22

V.    STANDARD OF REVIEW ..........................................................24

VI.   SUMMARY OF THE ARGUMENT...............................................26

VII.  ARGUMENT..............................................................................29

      A.    Kovacs Did Not Engage In Protected Activity ....................29

# TABLE OF CONTENTS
## (CONT'D)

Page

    1.    October 5, 2020 Phone Call With Sabrina Taylor ...................32

    2.    October 6, 2020 Phone Call With Schroeder ...........................33

    3.    October 8, 2020 Email To Schroeder .......................................33

    4.    October 12, 2020 Second Call With Schroeder .......................34

    5.    October 12, 2020 Email To Toth ..............................................34

    6.    October 19, 2020 Conversation With Elliott And Wynn .........34

    7.    October 20, 2020 Conversation With Elliott, Toth
           And Wynn .................................................................................35

  B.    Kovacs Cannot Demonstrate A Causal Connection ............................39

  C.    Kovacs' Probable Cause Finding Does Not Establish A Causal
       Connection...........................................................................................41

    1.    Kovacs Waived Her Probable Cause Argument By Failing
           To Raise It In Opposition To UT's Motion For Summary
           Judgment .................................................................................41

    2.    The District Court Properly Ascribed No Weight To The
           Probable Cause Finding ..........................................................43

        a.    Title VII Does Not Require Courts To Give
               Deference To An Administrative Agency's Finding.......43

        b.    The District Court Properly Explained Why It
               Did Not Rely On The Probable Cause Finding .............47

  D.    Kovacs Cannot Demonstrate Pretext ..................................................49

VIII.  CONCLUSION.................................................................................................54

CERTIFICATE OF COMPLIANCE....................................................................55

CERTIFICATE OF SERVICE ............................................................................56

ADDENDUM—DESIGNATION OF RELEVANT DISTRICT COURT
    DOCUMENTS ..............................................................................................57

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Abdulnour v. Campbell Soup Supply Co. LLC*,
502 F.3d 496 (6th Cir. 2007) ..........................................................................50, 51

*Adamov v. United States Bank Nat'l Ass'n*,
681 F. App'x 473 (6th Cir. 2017) ....................................................................49

*Alexander v. Caresource*,
576 F.3d 546 (6th Cir. 2009) .......................................................................*passim*

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)..........................................................................................24

*Arredondo v. Beer Barrel Inc.*,
Case No. 3:21-cv-00709, 2022 U.S. Dist. LEXIS 221949
(N.D. Ohio Dec. 9, 2022)..................................................................................36

*Blick v. Ann Arbor Pub. Sch. Dist.*,
105 F.4th 868 (6th Cir. 2024) ..........................................................................24

*Blizzard v. Marion Tech. Coll.*,
698 F.3d 275 (6th Cir. 2012) ............................................................................30

*Booker v. Brown & Williamson Tobacco Co.*,
879 F.2d 1304 (6th Cir. 1989) ..........................................................................30

*Braithwaite v. Timken Co.*,
258 F.3d 488 (6th Cir. 2001) ............................................................................50

*Briggs v. Univ. of Cincinnati*,
11 F.4th 498 (6th Cir. 2021) .............................................................................49

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986).........................................................................................24

*Chapman v. Univ. of Toledo*,
Case No. 3:23-cv-1022, 2023 U.S. Dist. LEXIS 208083
(N.D. Ohio Nov. 21, 2023) ...............................................................................23

# TABLE OF AUTHORITIES
## (CONT'D)

**Page(s)**

*Chattman v. Toho Tenax Am., Inc.*,
  686 F.3d 339 (6th Cir. 2012) ..............................................................50

*Clark Cnty. Sch. Dist. v. Breeden*,
  532 U.S. 268 (2001)..........................................................................38

*Davis v. Univ. of Toledo*,
  Case No. 3:22-cv-301, 2025 U.S. Dist. LEXIS 48738
  (N.D. Ohio March 18, 2025) ...............................................................22

*Fitzpatrick v. Henderson*,
  55 F. App'x 248 (6th Cir. 2002) .........................................................52

*EEOC v. Ford Motor Co.*,
  98 F.3d 1341 (6th Cir. 1996) (unpublished)......................................19

*EEOC v. Ford Motor Co.*,
  No. 95-3019, 1996 U.S. App. LEXIS 26263
  (6th Cir. Sep. 30, 1996)................................................................44, 45

*Geboy v. Brigano*,
  489 F.3d 752 (6th Cir. 2007) .............................................................42

*Imwalle v. Reliance Med. Prods.*,
  515 F.3d 531 (6th Cir. 2008) .............................................................39

*Jackson v. Genesee Rd. Comm'n*,
  999 F.3d 333 (6th Cir. 2021) ........................................................29, 30

*Johnson v. Cuyahoga Cnty. Juvenile Court Clerk's Office*,
  Case No. 1:21-cv-2109, 2023 U.S. Dist. LEXIS 17921
  (N.D. Ohio Feb. 2, 2023) ...................................................................35

*Johnson v. Univ. of Cincinnati*,
  215 F.3d 561 (6th Cir. 2000) .............................................................29

# TABLE OF AUTHORITIES
### (CONT'D)

**Page(s)**

*Joseph v. McDonough,*
  Case No. 21-1736, 2022 U.S. App. LEXIS 35719
  (6th Cir. Dec. 27, 2022) ...................................................................36

*Kenney v. Aspen Technologies, Inc.,*
  965 F.3d 443 (6th Cir. 2020) ............................................................39

*Khalaf v. Ford Motor Co.,*
  973 F.3d 469 (6th Cir. 2020) ......................................................30, 36

*Kitchen v. Whitmer,*
  106 F.4th 525 (6th Cir. 2024) ...........................................................42

*Laster v. City of Kalamazoo,*
  746 F.3d 714 (6th Cir. 2014) ............................................................25

*Longs v. Ford Motor Co.,*
  647 F. Supp. 2d 919 (W.D. Tenn. 2009) ...........................................37

*Mansfield v. City of Murfreesboro,*
  706 F. App'x 231 (6th Cir. 2017) ......................................................25

*Manzer v. Diamond Shamrock Chems. Co.,*
  29 F.3d 1078 (6th Cir. 1994) ............................................................49

*Mickey v. Zeidler Tool & Die Co.,*
  516 F.3d 516 (6th Cir. 2008) ............................................................41

*Midland Asphalt Corp v. United States,*
  489 U.S. 794 (1989).............................................................................1

*Redlin v. Grosse Pointe Pub. Sch. Sys.,*
  921 F.3d 599 (6th Cir. 2019) ............................................................25

*Sault Ste. Marie Tribe of Chippewa Indians v. Engler,*
  146 F.3d 367 (6th Cir. 1998) ............................................................42

# TABLE OF AUTHORITIES
## (CONT'D)

**Page(s)**

*Scott v. Harris*,
  550 U.S. 372 (2007)................................................................24

*Scott v. Solano Cty. Health & Social Servs. Dept.*,
  Case No. 06-1216, 2008 U.S. Dist. LEXIS 75757
  (E.D. Cal. Aug. 15, 2008)........................................................37

*Scottsdale Ins. Co. v. Flowers*,
  513 F.3d 546 (6th Cir. 2008) ..........................................4, 21, 41, 42

*Small v. Alpine Access Inc.*,
  Case No. 2:19-cv-2722, 2021 U.S. Dist. LEXIS 148818
  (W.D. Tenn Aug. 9, 2021)........................................................33

*Smith v. Chrysler Corp.*,
  155 F.3d 799 (6th Cir. 1998) ...................................................50

*St. Mary's Honor Ctr. v. Hicks*,
  509 U.S. 502 (1993)................................................................49

*Univ. of Texas S.W. Med. Ctr. v. Nassar*,
  570 U.S. 338 (2013)................................................................25

*Wright v. Sears, Roebuck v. Co.*,
  81 F. App'x 37 (6th Cir. 2007) .................................................51

*Wynn v. Univ. of Toledo*,
  Case No. 3:22-cv-1899, 2024 U.S. Dist. LEXIS 101335
  (N.D. Ohio June 7, 2024)........................................................22

*Yazdian v. ConMed Endoscopic Techs., Inc.*,
  793 F. 3d 634 (6th Cir. 2015) ..................................................30

## STATUTES

28 U.S.C. § 1291 ..........................................................................1

28 U.S.C. § 1292(b) .....................................................................22

# TABLE OF AUTHORITIES
## (CONT'D)

**Page(s)**

Title VII of the Civil Rights Act of 1964,
    42 U.S.C. § 2000e, *et seq*. ("Title VII") ......................................................*passim*

Fair Labor Standards Act of 1938, as amended
    29 U.S.C. § 201, *et seq*. ("FLSA") ....................................................33

Rehabilitation Act of 1973,
    29 U.S.C. § 701, *et seq.* ...................................................................38

Vietnam Veterans' Readjustment Assistance Act of 1974, as
    amended,
    38 U.S.C. § 4212 ("VEVRAA")........................................................38

## OTHER AUTHORITIES

41 C.F.R. § 60-300.5(a)(2)...........................................................................38

41 C.F.R. § 60-300.5(a)(6)...........................................................................38

Fed. R. App. P. 4(a)(1)(A) ............................................................................1

Fed. R. App. P. 32(g) ..................................................................................55

Fed. R. App. P. 32(1)(7)(B)(i) .....................................................................55

Fed. R. Civ. P. 32(a)(5) ...............................................................................55

Fed. R. Civ. P. 32(a)(6)................................................................................55

Fed. R. Civ. P. 56(a).....................................................................................24

Sixth Circuit Rule 26.1 ..................................................................................i

Sixth Circuit Rule 30(g)...............................................................................57

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

While Appellee remains ready to participate in oral argument should the Court deem it beneficial, Appellee respectfully states that it does not believe oral argument is necessary in this case. Appellee believes that the briefing sufficiently presents the appropriate issues to the Court for evaluation and that this appeal does not implicate either particularly complex facts or issues that would warrant expenditure of judicial resources on oral argument.

## I.    __JURISDICTIONAL STATEMENT__

This case involved two discrete adverse actions before the District Court: Appellant's demotion and subsequent termination.  The District Court issued its decision and judgment granting summary judgment to Appellee on the termination claim on January 10, 2024.  Op., R.34.  On January 17, 2025, the parties filed a Stipulation of Dismissal with prejudice pertaining to Appellant's demotion claim.  Stip., R.63.  On January 21, 2025, the District Court approved the Stipulation of Dismissal and closed the case.  Order, R.64.

Accordingly, the order granting summary judgment to Appellee on Appellant's termination claim serves as the decision to be reviewed in this case.  28 U.S.C. § 1291; *Midland Asphalt Corp v. United States*, 489 U.S. 794, 798 (1989).  Appellant timely filed this appeal on January 21, 2025.  Notice of Appeal, R.65; *see* Fed. R. App. P. 4(a)(1)(A).  This Court has jurisdiction over this appeal under 28 U.S.C. § 1291.

## II.   **<u>STATEMENT OF THE ISSUES</u>**

Appellant brought, and the District Court dismissed, a claim of retaliation under Title VII of the Civil Rights Act of 1964.  The issues presented are:

1.      Whether the University of Toledo retaliated against Appellant for engaging in protected activity when it terminated her employment;

2.      Whether the probable cause finding issued by the Ohio Civil Rights Commission was properly excluded by the District Court.

## III.  **INTRODUCTION**

Appellant Theresa A. Kovacs sued her former employer, the University of Toledo, for retaliation.  Causation is an essential element in retaliation cases.  Here, Kovacs purportedly engaged in protected activity in October 2020 and was terminated in February 2021.  The District Court, relying on black letter law issued by this Court, properly concluded that this period of four months was not sufficient, in and of itself, to establish temporal proximity under the fourth prong of a *prima facie* retaliation analysis.  Kovacs, above and beyond temporal proximity between the two events, offered little more than conspiracy theories regarding discussions between non-decisionmakers to establish this element.  The District Court easily discarded this theory, finding "Plaintiff discusses only suppositions and speculation about Schroeder, Wynn, Postel, and others.  But she has not established that any of these individuals had anything to do with Elliott and Beck's decision to terminate her."  Op., R.34, PageID#2767.  The District Court found that Kovacs did not establish the fourth prong of her *prima facie* case; therefore, it did not conduct a pretext analysis.

Subsequent to the issuance of the summary judgment opinion by the District Court, Kovacs for the first time argued that the probable cause finding issued by the Ohio Civil Rights Commission ("OCRC"), when taken into consideration with other "evidence," nudged her across the causal connection line.  Kovacs' Motion for

Reconsideration (R.36) was denied on both procedural and substantive bases. Kovacs failed to raise her argument in her opposition to UT's Motion for Summary Judgment. Op., R.40, PageID#2802, citing *Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 553 (6th Cir. 2008) ("we have found issues to be waived when they are raised for the first time in motions requesting reconsideration or in replies to responses."). However, the District Court also undertook a substantive analysis and properly relied upon the seminal Sixth Circuit case in this area, *Alexander v. Caresource*, 576 F.3d 546, 551 (6th Cir. 2009), in ascribing little, if any, weight to the probable cause finding issued by the OCRC in this case.

The District Court correctly applied the *Alexander* factors and found that the cause finding presented "trustworthiness problems" because it is "largely hearsay;" the OCRC relied upon different protected activity than the District Court; the OCRC's reliance on this different protected activity resulted in a flawed causal connection analysis; the finding is not a "model of clarity in its explanation of its conclusions regarding Plaintiff's termination" by blending its analysis of race discrimination and retaliation; and this "conflation of the two different theories is likely to be confusing and unhelpful to a factfinder." Op., R.40, PageID#2804-05.

While Kovacs makes any number of arguments regarding the probable cause finding, she improperly failed to raise these arguments in opposition to UT's Motion for Summary Judgment, and even if she did, the District Court appropriately applied

the controlling *Alexander* factors in determining that the probable cause finding does not aid in establishing the causal connection element of her *prima facie* case.

Appellant cannot demonstrate a causal connection between her protected activity and her termination. Her numerous arguments regarding the probable cause finding fall flat as the District Court undertook the appropriate analysis and found that it is of little evidentiary value. This Court should affirm the judgment of the District Court.

## IV.   STATEMENT OF THE CASE

Appellant Theresa Kovacs ("Kovacs") was a 17-year employee of Appellee the University of Toledo. ("UT").  She worked in the Human Resources Department, which was recognized as a low-functioning unit.  Accordingly, when UT hired Gregory Postel to serve as its President in July 2020, President Postel identified the modernization of the HR Department as one of his key initiatives.  This modernization resulted in largescale changes: the Director of Human Resources (Wendy Davis), along with two other high-level HR employees (Dreyon Wynn and Carolyn Chapman), were terminated; systems were scrutinized and overhauled; and President Postel hired two individuals he knew from previous positions to serve as the highest-ranking (John Elliott) and second highest-ranking (Melissa Hurst) employees in HR.

Elliott and Hurst began working for UT in October 2020 and moved quickly. By November 2020, they recognized that Kovacs did not perform at a Director level and demoted her.  Kovacs' team was stymied by poor customer service, long and lagging responsive times, no development plans, no employee evaluations, no improvement plans, no data tracking, and no vision or strategy for building and improving the team's processes, timelines, and performance.

Elliott and Hurst recognized that Kovacs was not fit to serve as a Director, but they also valued her long service and institutional knowledge.  Kovacs was therefore

demoted instead of terminated, with the hope that she could leverage her institutional knowledge and function more effectively at a lower-level position. But Kovacs was not receptive to her new role: she failed to train two assigned mentees, she failed to engage in her new duties, she failed to address two large projects assigned to her, and, most importantly, she approached a different HR supervisor and asked to work on her team because she "was not busy," which was absurd given HR's frenetic workload amidst the modernization. UT had seen enough and terminated Kovacs' employment in February 2021.

### A.    Appellant's Employment History

Kovacs began working for UT as a Benefits Specialist in January 2003. Kovacs Depo., R.14-1, PageID#152; Offer Letter, R.14-1, PageID#413. From 2003–2020, Kovacs held several positions within UT's Human Resources Department. Kovacs Depo., R.14-1, PageID#152-53. In April 2018, she was named Director, HR Academic, Student Services & Administration. Kovacs Depo., R.14-1, PageID#153; Pos. Description, R.14-1, PageID#418-21. Kovacs supervised seven employees in this position. Kovacs Depo., R.14-1, PageID#139-40. She managed hiring, recruiting and talent management for UT's main campus. A different employee performed the same duties for UT's health science campus. *Id.*, PageID#155-56. This employee, Carolyn Chapman, was terminated very shortly after Elliott and Hurst were hired in October 2020. *Id.*, PageID#256. Every position

Kovacs held at UT was "unclassified," which meant that she could be terminated by UT at any time for any reason. *Id.*, PageID#148-49.

Kovacs reported to former Associate Vice President and Chief Human Resources Officer Wendy Davis. *Id.*, PageID#137-38. Davis, in turn, reported to UT's Executive Vice President for Finance and Administration/Chief Financial Officer Matthew Schroeder, who, in turn, reported to President Postel. *Id.* Schroeder terminated Davis on September 18, 2020, which was a step in the HR modernization process. Schroeder Depo., R.17-1, PageID#943-44.

On September 22, 2020, Schroeder announced that Davis was removed, and that John Elliott and Melissa Hurst were hired in the positions of Senior Associate Vice President & Chief Human Resource Officer and Executive Director of Talent Strategy and Development, respectively. Kovacs Depo., R.14-1, PageID#229; Rebuttal, R.14-1, PageID#460; Elliott Depo., R.15-1, PageID#581; Offer Letter, R.15-1, PageID#687-88; Hurst Depo., R.16-1, PageID#753. Elliott and Hurst began working for UT in early October 2020. Elliott Depo., R.15-1, PageID#582; Hurst Depo., R.16-1, PageID#751-53. Following Davis' termination, Kovacs briefly reported to Elliott (Kovacs Depo., R.14-1, PageID#231), and then reported to Hurst effective October 15, 2020. Kovacs Depo., R.14-1, PageID#255; Supervisor Email, R.14-1; PageID#511-12.

**B.** **HR Modernization Is Identified As An Initiative By UT President Postel**

UT hired Gregory Postel as Interim President in July 2020.  President Postel "put in place a number of initiatives to help reposition" UT, one of which was HR modernization.  Schroeder Depo., R.17-1, PageID#940, 944.  Schroeder worked closely with President Postel regarding this initiative, and Elliott was responsible for its implementation in HR.  Schroeder Depo., R.17-1, PageID#933, 940; Elliott Depo., R.15-1, PageID#602-03.  UT's HR Department needed to modernize due to "overall bureaucracy," it was viewed "not as a partner" with other UT units, and there was a lack of training and organizational development such as "[b]asic employment, labor, HRIS dashboards."  Schroeder Depo., R.17-1, PageID#940-41.  As part of the modernization process, HR needed to be more of a customer-focused resource as opposed to a "paper-pushing entity."  *Id.*  Kovacs was aware of President Postel's HR modernization initiative because he distributed a memo to this effect.  Kovacs Depo., R.14-1, PageID#230.

The hiring of Elliott was one of the first steps in the HR modernization process, as was Wendy Davis's termination.  Schroeder Depo., R.17-1, PageID#944.  As part of the modernization effort, Elliott began an assessment of HR's staffing, performance, processes technology and governance.  Elliott Aff., R.15-1, ¶ 3, PageID#692.  Elliott met with 10-20 campus leaders as part of this assessment.

Elliott Depo., R.15-1, PageID#606.  He did not receive "one positive report on HR from anybody." *Id*.

Through this review, Elliott learned that Kovacs' team "had long and lagging response times" (*id.,* at PageID#609); no development plans (*id.,* at PageID#610); no employee evaluations or improvement plans (*id.,* at PageID#612); and no vision or strategy for building and improving the team's processes timelines and performance. *Id.,* at PageID#617; Elliott Aff., R.15-1, ¶ 4, PageID#692.  He found the performance of Kovacs' team to be, at best, **mediocre**.  Elliott Depo., R.15-1, PageID#604; Elliott Aff., R.15-1, ¶ 4, PageID#692.

Hurst uncovered similar things as Elliott:

> I found that Ms. Kovacs had not completed required performance evaluations for her team in one or two years. She had not instituted any professional development or guidance plans for her team, and there were at least two team members who believed that they had not been adequately trained by her in their job duties and responsibilities.  As the Director, it was her responsibility to manage and support her team in their development.

Hurst Aff., R.16-1, ¶ 4, PageID#871.  Kovacs admits that much of this is true: when Hurst asked her in October 2020 if she had completed employee evaluations, she indicated she was still working on 2018, 2019 and 2020 evaluations for her subordinates.  Kovacs Depo., R.14-1, PageID#324-26.  When Hurst asked Kovacs about her failure to conduct evaluations, she had "no answer."  Hurst Depo., R.16-1, PageID#800.  Kovacs was aware that at least one of her subordinates (Chanie

Reinhart) reported to Elliott/Hurst that she had not been properly trained by her. Kovacs Depo., R.14-1, PageID#295-96. One of Kovacs' other subordinates, Jason Beck, also indicated that he had not been properly trained. Hurst Depo., R.16-1, PageID#817-18.

Additionally, Hurst asked Kovacs to manage two high-level, important projects: (1) evaluating, formalizing, and managing UT's separation process; and (2) implementing a quarterly personnel action report for submission to UT's Board. Hurst Aff., R.16-1, ¶ 4, PageID#871. The first project "should have taken no more than two to three weeks." Hurst Depo., R.16-1, PageID#792. Kovacs never completed the first project. *Id.,* at PageID#791-93, 812-14. Despite several prompts and requests for updates, Kovacs likewise did not complete the second project in a timely manner. *Id.,* at PageID#791-93, 815-16.

## C.   **Kovacs Is Demoted**

While this employment action is no longer at issue in this case, Kovacs devotes a portion of her brief to her demotion and the purported "shifting reasons" for it. (Appellant Brief, pp. 10-11). Hurst made the decision to demote Kovacs from the position of Director, HR Academic, Student Services & Administration to the position of Senior HR Consultant, and Elliott approved it in his capacity as UT's Chief Human Resources Officer. Elliott Depo., R.15-1, PageID#590; Hurst Depo., R.16-1, PageID#766-67. Elliott and Hurst informed Kovacs of her demotion on

November 6, 2020, which took effect December 1, 2020. Kovacs Depo., R.14-1, PageID#272; Demotion Letter, R.14-1, PageID#541-42. Kovacs salary was not decreased—she continued to earn $93,840. Kovacs Depo., R.14-1, PageID#150; Demotion Letter, R.14-1, PageID#541-42.

Hurst demoted Kovacs because of a "pervasive pattern of ineffective leadership." Hurst Depo., R.16-1, PageID#801. Hurst cited specific examples that demonstrated Kovacs was not leadership material, but was of the belief that she could be retained in a reduced capacity because of her "historical knowledge." *Id.,* at PageID#768.

Effective January 4, 2021, Kovacs began reporting to Jason Beck, whom she previously supervised. Kovacs Depo., R.14-1, PageID#271-72, 302; Hurst Depo., R.16-1, PageID#788-89; Reporting Email, R.14-1, PageID#547. Following her demotion, Kovacs did not supervise subordinates, but she was assigned to mentor two other employees. Kovacs Depo., R.14-1, PageID#294-95. During a regularly scheduled one-on-one meeting, Kovacs admittedly told Hurst that she thought it was "bullshit" that she had to report to someone she used to supervise. Kovacs Depo., R.14-1, PageID#303. She made the same comment on multiple occasions to Beck. Beck Dec., R.18-2, ¶ 8, PageID#1079.

### D.    Kovacs Fails To Connect The Dots Of Her Conspiracy Theory

Kovacs' only theory in support of her causal connection argument fails to hold water.  (Appellant Brief, pp. 13-14, 23-25).  She makes much of the fact that HR employee Dreyon Wynn (who filed a race discrimination and retaliation lawsuit, and failed) had a conversation with Willie McKether, UT's Vice President of Diversity and Inclusion, shortly after his termination on January 26, 2021, regarding the termination of three African American employees, as well as Kovacs' demotion.  Wynn also emailed President Postel regarding his termination and alleged race discrimination.   On January 28, there was a meeting between McKether and President Postel.  One of the topics was "HR terminations."  McKether wanted to ensure President Postel was aware of Wynn's email, and he does not recall anything further about the conversation.  McKether Depo., R.19-1, PageID#1104.  President Postel recalls McKether wanting him to know "that Dre had reached out to him."  Postel Depo., R.20-1, PageID#1165.  President Postel referred this matter to general counsel.  *Id.*  He has no recollection of telling McKether that he would follow up with Schroeder, "but it's possible that [he] did."  *Id.,* at PageID#1170-71).

It seems that Kovacs' theory of the case is that UT converted Kovacs' demotion into a termination to "shore up" its arguments in defense to anticipated EEO charges/claims from Dreyon Wynn.  To describe this as being deep in the weeds of a conspiracy theory would be an understatement.  Kovacs makes scattered

allegations involving Schroeder and Postel, but fails to coherently connect the dots into a rational, plausible theory.  Kovacs offers no proof that Schroeder or Postel were involved in the decision to terminate Kovacs (because they were not, as discussed below).  Kovacs' attempt to fabricate some nefarious plot out of a meeting between Postel and McKether is absurd.  The District Court agreed, as explained in the Law section.

### E.   Kovacs Is Terminated

Following her demotion, Kovacs disengaged with her team and new director. Hurst explained the disengagement as follows (Hurst Depo., R.16-1, PageID#789):

> She would not attend meetings.  She was frequently out of the office and requested to work remotely.  In meetings that she did attend, she was not engaged and did not offer up anything in terms of, you know, communication or ideas when asked. She was also specifically asked to mentor and work with two team members, Chanie [Reinhart] and Keenen Fisher, and she did not offer them any training or any mentorship.

Beck told Hurst about Kovacs' disengagement that he observed firsthand as well—such as not providing tools or resources to lesser-experienced HR Consultants, and not providing substantive responses to questions in meetings.  *Id.,* at PageID#789; Beck Dec., R.18-2, ¶ 8, PageID#1079.  Kovacs did not make any progress on the two major projects Hurst assigned to her as they were completed at the last minute and riddled with errors.  Beck agreed with Hurst that Kovacs failed to deliver on these two projects because he inherited both following Kovacs' dismissal.  Beck

14

Dec., R.18-2, ¶ 9, PageID#1079-80.  Chanie Reinhart continued to complain to Hurst and Beck that Kovacs was not training her and provided specific examples.  Hurst Depo., R.16-1, PageID#789-91; Beck Dec., R.18-2, ¶ 7, PageID#1079.  As for Fisher, it was apparent he was not receiving proper training because he "could not do anything," and "did not understand the role."  Hurst Depo., R.16-1, PageID#791; Beck Dec., R.18-2, ¶ 8, PageID#1079.

But to make matters worse, in addition to her disengagement, Kovacs approached Bethany Ziviski, UT's recently-hired Labor Relations Director, and informed her that she "wasn't busy and wanted a different role."  Hurst Depo., R.16-1, PageID#805-06; Ziviski Dec., R.18-1, ¶¶ 4-7, PageID#1076-77.  Kovacs' comment was significant to Elliott and served as the proverbial straw that broke the camel's back:

> It was an indicator to [Hurst] and myself that she was not interested in being the senior consultant because there was plenty of work to do, and so it gave the impression that she wasn't interested in doing that job, so she wanted to go and do the other -- go do another job.  And so if you're not interested in doing that senior consultant job -- that was the impression that she was giving, she didn't want to do that job, so we discharged her employment because that was the job that we had for her to do at that time.

Elliott Depo., R.15-1, PageID#627.  This comment was similarly significant to Beck: it cemented his belief that Kovacs had no intention of embracing her new role,

especially considering her area was understaffed.  Beck Dec., R.18-2, ¶ 10, PageID#1080.

Beck made the decision to terminate Kovacs' employment, and Hurst and Elliott agreed with the decision.  Hurst Depo., R.16-1, PageID#809; Beck Dec., R.18-2, ¶ 10, PageID#1080.  On February 9, 2021, Elliott and Beck presented a 90-day notice of termination to Kovacs.  Kovacs Depo., R.14-1, PageID#341-42; Term. Letter, R.14-1, PageID#564.  Kovacs stopped working on that day but was paid in full through May 9, 2021.  Kovacs Depo., R.14-1, PageID#342.

## F.    Kovacs' Repeated Attempts To Introduce Her OCRC Probable Cause Finding Are Denied

The Ohio Civil Rights Commission issued a probable cause finding against UT on the basis of Kovacs' race and retaliation.  P.C. Finding, R.1-6, PageID#31-36. Kovacs has repeatedly attempted to introduce this finding, with no success.

Kovacs first attempted to introduce the OCRC's investigatory file (not her probable cause finding) in the form of a Motion for Judicial Notice.  R.22, PageID#1299-1301.  Notably, Kovacs did not ask the District Court to take judicial notice of the probable cause finding in her OCRC case—but curiously, she filed a separate Motion asking the Court to take judicial notice of the OCRC's probable cause finding in the case of a different UT employee: Carolyn Chapman (whose lawsuit was dismissed for failing to exhaust administrative remedies, as discussed

below).   Motion for Judicial Notice, R.21, PageID#1269-72.   In denying both

Motions without prejudice, the District Court observed (Or., R.32, PageID#2722):

> "[T]he OCRC's *legal conclusion* that the evidence of
> racial discrimination against Chapman met its probable
> cause standard is irrelevant here.  Standing alone, the fact
> that the OCRC determined that there was probable cause
> to believe that the University of Toledo discriminated
> against Chapman does not bear on the question of whether
> Defendant wrongfully terminated Plaintiff.   Even the
> probable cause determination **in Plaintiff's own OCRC
> matter** has 'an evidentiary value of practically **zero**.'"
> citing *Alexander v. CareSource*, 576 F.3d 551, 561-62 (6th
> Cir. 2009); *see also Meeker v. Vitt*, 2006 WL 8450990, at
> *4 (N.D. Ohio Mar. 31, 2006) (O'Malley, J) ("Under Title
> VII, it is the jury (or court) which is the fact-finder, not the
> EEOC or OCRC.  A probable cause determination letter
> by an administrative agency has little, if any, probative
> value.").

Other than the above statement, the District Court did not undertake an

analysis of the admission of Kovacs' OCRC probable cause determination because

it was not at issue at that time.  Notwithstanding, in her Memorandum in Opposition

to Defendant's Motion for Summary Judgment, Kovacs referred to the OCRC's

probable cause findings in her charge, as well as other charges of discrimination filed

by other UT employees.  Opp. Memo., R.31, PageID#2643.  However, Kovacs did

not argue in summary judgment briefing that the District Court should take these

probable cause findings into consideration in rendering its legal analysis, and she did

not cite any legal authority in support of that proposition.   *Id.*   Other than

acknowledging the existence of these probable cause determinations (Op., R.34,

PageID#2750), the District Court made no other mention of the OCRC or its findings in rendering its dispositive motion decision. Op., R.34. This is presumably because Kovacs did not ask the District Court to do so.

Kovacs then filed a Motion for Partial Reconsideration of the District Court's summary judgment ruling, contending for the first time that her OCRC probable cause determination (as opposed to the OCRC's investigatory file) should have been considered at the summary judgment stage. R.36, PageID#2770-78. In this Motion, Kovacs advocated that the probable cause finding "provide[s] additional evidence of causal connection, i.e., a link between her protected activity and the Defendant's decision to terminate her." *Id.,* at PageID#2777. But Kovacs also conceded that the OCRC finding, "on its own," does not "establish[] a prima facie case that she was unlawfully terminated."[1] *Id.*

The District Court denied her attempt. R.40, PageID#2799-806. It rejected that the OCRC finding is admissible for its truth. "In other words, I would have to accept as a matter of law on summary judgment that the OCRC finding of probable cause is evidence that Defendant retaliated against the Plaintiff in firing her. I reject this conclusion for several reasons." *Id.,* at PageID#2802. The District Court then

---

[1] Kovacs now argues the exact opposite: "The very presence of the Probable Cause Finding establishes that a reasonable jury could find that Kovacs was terminated unlawfully. Accordingly, summary judgment in favor of the University was improper and should be reversed." (Appellant Brief, p. 42).

cited the pertinent portion of *EEOC v. Ford Motor Co.*, 98 F.3d 1341 (6th Cir. 1996)

(unpublished), which held, among other things:

> Unlike many statutory administrative decision review
> procedures, where the courts of appeals owe deference to
> the factual findings of an administrative agency (and the
> district courts are typically never involved in judicial
> review), the Title VII context is not one of these processes.
> In Title VII cases, either a jury or a district judge is the
> fact-finder. The district court, and the court of appeals,
> owes no deference to what the EEOC thought the facts
> were when it brought the case before the district court.

*Id.,* at PageID#2802.  Further, the *Ford Motor* Court held that "an EEOC cause

determination carries an evidentiary value of practically zero." *Id.*  Kovacs made no

attempt at the District Court level, or before this Court, to address this Court's

holding in *Ford Motor*.

The District Court then undertook an analysis of the seminal case issued by

this Court in this area, *Alexander v. CareSource*, 576 F.3d 551, 561-62 (6th Cir.

2009).  *Alexander* squarely addresses the issue at hand: the admissibility of OCRC

probable cause determinations at the summary judgment stage. *Id.,* at PageID#2803.

As the District Court pointed out, the *Alexander* court affirmed the trial court's

decision *not* to give the OCRC letter much, if any, weight in its summary judgment

determination.  *Id.* (emphasis in original).  "Because the lower court considered the

same facts as the agency, the differing conclusion in the agency report does not by

itself establish a material issue of fact, and there is no error by the district court in

19

not assigning evidentiary weight to that conclusion." *Alexander*, 576 F.3d at 563. The Sixth Circuit explicitly found that there was no error where, as here, the District Court assigned zero evidentiary weight to the OCRC report.

Kovacs repeats (Appellant Brief, p. 22) her argument asserted before the District Court: that it did not mention the four-factor test utilized in the Sixth Circuit to determine whether an investigative report is trustworthy.  Mtn. to Certify, R.42, PageID#2814.  This is simply untrue: *see* Op., R.40, PageID#2803, FN4.  The District Court identified the following trustworthiness issues presented by the OCRC's investigate report and finding in Kovacs' charge (using *Alexander* as a guide, no less).  *Id.,* at PageID#2804-05.  They include:

- The OCRC letter is "largely hearsay."

- The OCRC's instances of protected activity are different from those found by the District Court.

- The OCRC emphasized a conversation between a UT employee and UT's Vice President of Diversity in relationship to the causal connection element of Kovacs' termination.  The District Court found the conversation in question is not the relevant protected activity and the "resulting conclusions built on it, confuses the issues that are relevant to this case."

- The OCRC letter's explanations regarding its termination conclusions are "not a model of clarity."

- The OCRC letter blends its analysis of race discrimination and retaliation.  This is only a retaliation case.  "The OCRC's conflation of the two different theories is likely to be confusing and unhelpful to a factfinder."

In her Motion for Partial Reconsideration, Kovacs, for the first time, attempted to use the cause finding in support of her attempt to establish the causal connection element of her *prima facie* case. As set forth in the District Court's summary judgment opinion, the temporal proximity between Kovacs' protected activity and her termination (which was nearly four months) was inadequate on its own to establish a causal connection. In its ruling on the Motion for Partial Reconsideration, the District Court found that Kovacs' attempt to establish a causal connection by combining temporal proximity with the OCRC cause finding (which was also inadequate standing on its own) was insufficient to establish a causal connection. Or., R.40, PageID#2801. Furthermore, the District Court also noted that Kovacs failed to raise this probable cause finding as evidence of causal connection argument in response to the motion for summary judgment, "and it is too late to do so now." *Id.,* at PageID#2802, FN3, citing *Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 553 (6th Cir. 2008) ("we have found issues to be waived when they are raised for the first time in motions requesting reconsideration or in replies to responses."). This is analyzed in greater detail below.

Kovacs took yet another bite at the probable cause apple when she filed a Motion to Certify Order for Interlocutory Appeal, framing the issue as, "whether a trial court may exclude an OCRC Probable Cause finding in ruling on a motion for summary judgment without determining that the Probable Cause Finding is

21

untrustworthy according to the standard enunciated in *Alexander*." Mtn. to Certify, R.42, PageID#2819. The District Court found that the "OCRC report carried no preclusive effect and was not itself dispositive," and Kovacs did not satisfy the requirements under 28 U.S.C. § 1292(b) to warrant interlocutory review. Or., R.49, PageID#2862-63.

### G.    Lawsuits Brought By African American UT Human Resources Employees Fail

Before the District Court as well as this Court (Appellant Brief, pp. 12-13), Kovacs makes much of the fact that three other HR employees, who happen to be African American, were terminated shortly after Elliott was hired. These three former employees are Wendy Davis, UT's HR Director; Carolyn Chapman, Kovacs' counterpart who oversaw Clinical Operations; and Dreyon Wynn, UT's Director of Employee/Labor Relations.

Kovacs points out that Wynn and Davis filed charges of discrimination that resulted in probable cause findings. *Id.* However, she conveniently omits that all three filed federal lawsuits in the Northern District of Ohio alleging race discrimination and/or retaliation, and UT prevailed in full on all three, two on the merits and one due to Chapman's failure to exhaust administrative remedies. (*See Davis v. Univ. of Toledo*, Case No. 3:22-cv-301, 2025 U.S. Dist. LEXIS 48738 (N.D. Ohio March 18, 2025), Doc. Nos. 46, 47, summary judgment granted in full; *Wynn v. Univ. of Toledo*, Case No. 3:22-cv-1899, 2024 U.S. Dist. LEXIS 101335 (N.D.

Ohio June 7, 2024), Doc. Nos. 39, 40, summary judgment granted in full, appealed to Sixth Circuit Case No. 24-3586, oral argument scheduled for May 8, 2025; *Chapman v. Univ. of Toledo*, Case No. 3:23-cv-1022, 2023 U.S. Dist. LEXIS 208083 (N.D. Ohio Nov. 21, 2023), motion to dismiss for failure to exhaust administrative remedies granted in full, Doc. Nos. 13, 14).

Kovacs cannot rely upon race discrimination UT allegedly directed towards Wynn and Davis, when the District Court found no such race discrimination occurred.[2]

---

[2] Kovacs does not provide any analysis of what, if any, significance this Court should ascribe to Davis and Wynn's OCRC filings/findings.

## V.  **STANDARD OF REVIEW**

This Court reviews a grant of summary judgment *de novo*.  *Blick v. Ann Arbor Pub. Sch. Dist.*, 105 F.4th 868, 876 (6th Cir. 2024).  Summary judgment is warranted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts."  *Scott v. Harris*, 550 U.S. 372, 380 (2007).  With the benefit of that view of the facts, the nonmoving party must "make a sufficient showing on" *every* "element of her case" that she must prove to win at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  A "mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for [that party]."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

Kovacs bases her arguments on indirect, circumstantial evidence, so the *McDonald Douglas* burden shifting framework applies to her claim.  To establish a *prima facie* case of Title VII retaliation under the indirect evidence method, a plaintiff must show that:

> (1) he engaged in activity protected by Title VII; (2) his exercise of such protected activity was known by the defendant; (3) thereafter, the defendant took an action that was materially adverse to the plaintiff; and (4) a causal connection existed between the protected activity and the materially adverse action.

24

*Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014). "Title VII retaliation claims 'must be proved according to traditional principles of but-for causation,' which 'requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer.'" *Id.,* at 731 (quoting *Univ. of Texas S.W. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013)).

Once a plaintiff has established a *prima facie* case of retaliation, the analysis follows the familiar *McDonnell Douglas* burden-shifting framework. *Laster*, 746 F.3d at 731. The employer then must articulate a legitimate, non-retaliatory reason for the termination. *Redlin v. Grosse Pointe Pub. Sch. Sys.*, 921 F.3d 599, 613 (6th Cir. 2019) (citing *Mansfield v. City of Murfreesboro*, 706 F. App'x 231, 236 (6th Cir. 2017)). Plaintiff then must show that the reason that the defendant articulates is actually pretext for retaliation. *Redlin, supra,* 921 F.3d at 614 (citing *Mansfield*, 706 F. App'x at 236). "Although the burden of production shifts between the parties, the plaintiff bears the burden of persuasion through the process." *Redlin*, 921 F.3d at 614 (internal citation omitted).

25

## VI.  SUMMARY OF THE ARGUMENT

The District Court correctly held that Appellant failed to establish the fourth prong of her *prima facie* retaliation case: a causal connection between her purported protected activity and her termination. Op., R.34, PageID#2761-64, 2767.  Because it found that Kovacs could not establish a *prima facie* case, the District Court did not find it necessary to reach the pretext analysis.[3]

The District Court properly found no temporal proximity under the present circumstances:  Kovacs' last instance of protected activity was on October 20, 2020, and she was notified of her termination on February 9, 2021, a time period of nearly four months.  Instead, Kovacs was required to provide additional evidence of a causal connection.  To do so, she claimed that Schroeder "lurked" behind her termination.  The District Court had little trouble finding that "no actual evidence supports her argument that Schroeder had a role in her termination."  Op., R.34, PageID#2762.  Next, Kovacs asserts that three African American employees were terminated just before her, Wynn spoke to McKether about his concerns, and Kovacs was fired a few days after Wynn's discussion.  The District Court found that Kovacs could not causally connect these events because none of the individuals who

---

[3] Kovacs claims that the "District Court also found in favor of Kovacs on the question of pretext." (Appellant Brief, p. 28) (citing Op., R.34, PageID#2766). This is simply untrue: the District Court did not address the pretext question vis-à-vis Kovacs' termination because it found the lack of a causal connection to be dispositive.

received Wynn's complaints had anything to do with the termination decision.  And even if she could, there is no legal basis to establish a causal connection: "Plaintiff does not cite a case where a pattern or practice of discrimination can be used to overcome a motion for summary judgment on the causal connection element of a retaliation claim."  *Id.,* at PageID#2763.

After the District Court entered summary judgment in UT's favor, Kovacs filed a Motion for Partial Reconsideration arguing, for the first time, that her probable cause finding, when taken into account with other causal connection "evidence," results in satisfying the fourth prong.  Mtn. for Recon., R.36, PageID#2770-78.  Not only should this argument not be considered on the merits because it was not raised at the appropriate time, but it also fails on the merits as Kovacs' probable cause finding has "an evidentiary value of practically zero."

The District Court found that Kovacs engaged in protected activity, satisfying the first prong of her *prima facie* case.  This Court does not need to reach this issue if it affirms the District Court's determination that Kovacs did not establish a causal connection.  However, it is UT's position that Kovacs' attempted enforcement of a job-posting requirement contained in a potentially nonexistent conciliation agreement on behalf of a person whose race was unknown to Kovacs does not satisfy this *prima facie* element either.

Similarly, this Court does not need to reach the pretext issue in the event it agrees with the District Court's analysis of the causal connection element. But if this Court determines that Kovacs satisfies all elements of her *prima facie* case, Kovacs is unable to demonstrate that UT's reasons for her termination were pretexts for retaliation.

## VII.  **ARGUMENT**

### A.    **Kovacs Did Not Engage In Protected Activity**

UT does not dispute the third prong of Kovacs' *prima facie* case as a termination is a materially adverse action.  However, UT contends that Kovacs' attempted enforcement of a potentially non-existent conciliation agreement that Kovacs had never seen and may not have been in effect to advocate on behalf of someone whose race was unknown to her, is insufficient to establish protected activity.  The District Court disagreed and found that Kovacs "was opposing conduct that she reasonably believed violated Title VII. … That she may have been wrong about what Title VII actually required in terms of job posting does not change this outcome."  Op., R.34, PageID#2760.  The District Court's analysis on this point misses the mark though, as a focus on a job posting requirement cannot form the seed of a Title VII retaliation claim for the simple reason that Title VII does not contain a job posting requirement.

Kovacs contends she engaged in opposition clause activity, not participation clause activity.  "[O]pposing any practice that the employee reasonably believes to be a violation of Title VII" constitutes protected activity.  *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 579 (6th Cir. 2000).  "[The Sixth Circuit] and the Supreme Court have imposed limited restrictions on what activity constitutes opposition activity."  *Jackson v. Genesee Rd. Comm'n*, 999 F.3d 333, 345 (6th Cir. 2021).

While a plaintiff need not make such a complaint "with absolute formality, clarity, or precision," the complaint must go beyond a "vague charge of discrimination." *Id.*, at 345 (quoting *Yazdian v. ConMed Endoscopic Techs., Inc.*, 793 F. 3d 634, 345 (6th Cir. 2015)).

"For a plaintiff to demonstrate a qualifying 'protected activity,' he must show that he took an '**overt stand** against suspected illegal discriminatory action.'" *Khalaf v. Ford Motor Co.*, 973 F.3d 469, 489 (6th Cir. 2020) (quoting *Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 288 (6th Cir. 2012) (emphasis added)). *See also Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1313 (6th Cir. 1989) (holding that complaints about "ethnocism" were too vague to constitute protected activity). Here, the District Court's analysis of protected activity is flawed because it does not address what Kovacs was attempting to do: enforce a job posting requirement in a potentially non-existent conciliation agreement. The District Court made no mention of the conciliation agreement in its opinion whatsoever.

Kovacs' purported protected activity focuses exclusively on a series of emails/conversations that relate to UT's Senior Associate Vice President for Administration in Facilities & Construction and Supply Chain Jason Toth's desire to remove subordinate Tracey Brown's position from the union and place it in a non-union position. As an initial matter, Kovacs admits she never discussed "race discrimination" with Elliott or Schroeder as it relates to the moving of Brown's

30

position.  Kovacs Depo., R.14-1, PageID#276.  Nor could she have—she did not know and to this day does not know Brown's race.  *Id.,* at PageID#246-47.  Instead, Kovacs' concerns regarding Toth's request to move Brown's position from a collective bargaining position to a non-collective bargaining position focused on whether the position should be *removed from the union*.  It is not in dispute, based on the communications identified by Kovacs and analyzed below, that the thrust of her concerns regarding the Brown position focused on the union/non-union designation.

Kovacs believed that the Tracey Brown position was required to be posted by UT pursuant to a conciliation agreement entered into between UT and the Office of Federal Contract Compliance Programs ("OFCCP").  *Id.,* at PageID#189-90, 235.  Kovacs' claims regarding this alleged "conciliation agreement" are truly bizarre.  She claims UT entered into a conciliation agreement in the 1980's (*id.*, at PageID#192); she may (*id.*, at PageID#190) or may not (*id.*, at PageID#237) have seen the agreement; never had a copy of it (*id.*); never communicated with anyone responsible for enforcing the agreement (*id.*, at PageID#192); did not know if it was still in effect, though acted as though it were (*id.*, at PageID#238); and never inquired as to whether it was still in effect (*id.*).  Thus, it appears Kovacs' protected activity is premised upon some sort of belief that a conciliation agreement (which Kovacs may not have seen, may not have been in effect, and she knew next to nothing about)

existed that required the posting of jobs.  Kovacs alleges the following instances of protected activity:

### 1.    *October 5, 2020 Phone Call With Sabrina Taylor*

Taylor was the Associate Vice President of Budgeting and Planning and reported directly to Schroeder.  Kovacs Depo., R.14-1, PageID#231-32.  Kovacs communicated two primary concerns to Taylor during this call, neither of which have anything to do with discrimination: 1) a job search is to be conducted for all positions per the OFCCP conciliation agreement; and 2) the work performed by Brown was "bargaining unit" work.  *Id.,* at PageID#235-37.

Kovacs' claim that she conveyed OFCCP requirements to Taylor meant nothing more than telling Taylor that UT should conduct a search for the position in question.  *Id.,* at PageID#236-37.  Although Kovacs concedes that UT was **supposed** to conduct a job search per the alleged terms of the conciliation agreement, "[t]hat doesn't mean it always happens."  Kovacs contends she also discussed "EEO laws and disparate impact" with Taylor, which was nothing more than explaining that a job search would open up the pool of potential candidates.  *Id.,* at PageID#238-39.  Kovacs admittedly did **not** reference any specific minority groups during this call.  *Id.,* at PageID#242.

### 2. *October 6, 2020 Phone Call With Schroeder*

Kovacs had a similar conversation on October 6th with Schroeder to her call the preceding day with Taylor. *Id.,* at PageID#244-46. Kovacs concedes **"we didn't have any kind of conversation about race. I didn't even know what Tracey Brown – if she's black or white or whatever. I don't even know what she was."** *Id.,* at PageID#246. Kovacs reiterated that their conversation did not focus on race—"Our conversation was about moving her out of the union into a nonunion position." *Id.,* at PageID#247.

### 3. *October 8, 2020 Email To Schroeder*

Schroeder asked Kovacs to send an email to him expressing her concerns with Toth's proposal. *Id.,* at PageID#248. She did so on October 8, 2020. Email, R.14-1, PageID#496-509. The only concern expressed by Kovacs in this email relates to exempts vs. non-exempt status under the Fair Labor Standards Act ("FLSA"). *Id.* Kovacs concedes this point and admits there are no references to any discrimination concerns or laws. Kovacs Depo., R.14-1, PageID#248-49. Reporting FLSA concerns does not equate to protected activity for purposes of Title VII. *See, e.g., Small v. Alpine Access Inc.*, Case No. 2:19-cv-2722, 2021 U.S. Dist. LEXIS 148818, *7 (W.D. Tenn Aug. 9, 2021) (plaintiff's participation in FLSA class action lawsuit "is not a Title VII proceeding, [plaintiff] did not participate in a protected activity that would subject Defendants to Title VII's anti-retaliation provision.").

33

### 4.    *October 12, 2020 Second Call With Schroeder*

Kovacs does not recall the content of this conversation, other than Schroeder shared a conversation he had with Toth that Toth wanted to have the union "out of his financial business."  Kovacs Depo., R.14-1, PageID#252-53.  Kovacs explained to Schroeder that some bargaining unit employees perform financial-related work—this does not place the particular position outside the bargaining unit.  *Id*.

### 5.    *October 12, 2020 Email To Toth*

Kovacs made the following passing references in an email to Toth on October 12, 2020 (Email, R.14-1, PageID#514):

- "Promoting an employee that does not meet the minimum qualifications goes against EEO."

- "To avoid potential disparate impact (Disparate impact is often referred to an unintentional discrimination) none the less, our practices must be uniformly and consistently applied." (Spelling and grammatical errors in original).

### 6.    *October 19, 2020 Conversation With Elliott And Wynn*

During this conversation, Kovacs and Wynn explained to Elliott how "public sector union works" since he did not have a background in this area.  Kovacs Depo., R.14-1, PageID#262-63.  She does not recall any further items discussed during that conversation.  *Id.,* at PageID#264.  This was Kovacs' first time communicating with Elliott about the Toth request.  *Id*.

### 7.   *October 20, 2020 Conversation With Elliott, Toth, And Wynn*

The only thing Kovacs could recall about this conversation is moving Brown's position "without a search," as she referenced in many of her conversations described above. *Id.,* at PageID#265.  Elliott informed Toth that Wynn and Kovacs raised concerns regarding the position, and asked Toth if he can defend this in court. Toth answered in the affirmative and that was the end of the conversation.  *Id.,* at PageID#270.   Kovacs concedes Toth does not need her approval to make this position change.  *Id.,* at PageID#254-55.  Kovacs also concedes that no employees (including Elliott) ever expressed disagreement or frustration with the concerns she raised regarding the classification of the position.  *Id.,* at PageID#261, 271.  As set forth in email exchanges, Toth was thankful for the guidance provided by Kovacs (Email, R.14-1, PageID#530), and he expressed to Elliott that her "direction was the right approach in terms of the job description and that I appreciated your assistance." *Id.,* at PageID#528.

These communications do not rise to the level of protected activity.   In *Johnson v. Cuyahoga Cnty. Juvenile Court Clerk's Office*, Case No. 1:21-cv-2109, 2023 U.S. Dist. LEXIS 17921, at *10 (N.D. Ohio Feb. 2, 2023), an African American employee submitted a written statement that "[o]ver the last 3 months with Juvenile Court, [she has] received unfair and **disparate treatment** in the position of Clerk's Office Staff Manager" and then detailed the issues she experienced—chiefly that

major changes had occurred in the Clerk's office that had "stripped away" her job duties and negatively impacted her ability to perform. The Northern District of Ohio found that this written statement did **not** constitute protected activity. It stated (at *27):

> In Plaintiff's written statement, her reference to "disparate treatment," without any reference to her race, is too vague of an allegation to be considered an allegation of racial discrimination. *See Booker*, 879 F.2d at 1312. Further, Plaintiff's question as to why she was being treated differently is also too vague to be considered an allegation of racial discrimination. An allegation of differential treatment is not enough to constitute a charge of discrimination. *See Caldwell v. Gasper*, 2022 U.S. App. LEXIS 30418, at *7 (6th Cir. Nov. 1, 2022). Rather, Plaintiff's written statement is merely a complaint regarding management decisions, not a statement alleging unlawful activity by her employer.

*See also Khalaf v. Ford Motor Co.*, 973 F.3d 469, 491 (6th Cir. 2020) (questionable that employee's email to employer's HR manager constituted protected activity where it merely catalogued instances of his subordinates' disrespect, poor work, and defensiveness, none of which he explicitly connected to being motivated by any race/national origin animus); *Joseph v. McDonough*, Case No. 21-1736, 2022 U.S. App. LEXIS 35719, at *9 (6th Cir. Dec. 27, 2022) (sending email in support of co-worker did not qualify as protected activity because, "although it separately mentioned [co-worker's] national origin and the term 'retaliation,' it did not assert any claim of illegal discriminatory action"); *Arredondo v. Beer Barrel Inc.*, Case No.

36

3:21-cv-00709, 2022 U.S. Dist. LEXIS 221949, at *10 (N.D. Ohio Dec. 9, 2022) (plaintiff's claim of general unfairness related to co-worker's termination did not rise to level of protected activity "without some additional communication that he felt the unfairness was racially motivated"); *Longs v. Ford Motor Co.*, 647 F. Supp. 2d 919, 932-33 (W.D. Tenn. 2009) (employee's complaint to his employer "must indicate that discrimination occurred because of sex, race, national origin, or some other protected class"; "[m]erely complaining in general terms of discrimination . . ., without indicating a connection to a protected class or providing facts sufficient to create that inference, is insufficient").[4]

To reiterate, the District Court made no mention of Kovacs' efforts to enforce the OFCCP conciliation agreement.  Instead, it focused on Kovacs' belief that "failing to publicly post the position would violate EEOC laws and would have a potential disparate and discriminatory impact on minority applicants." (Op., R.34,

---

[4] Based on the litany of cases cited above, although UT is unable to find a case directly on point, it appears that a plaintiff cannot engage in protected activity if they do not know the protected class characteristics of the impacted individual.  One cannot make a connection to a protected class if one is unaware of the protected class at issue.  *See*, *e.g., Scott v. Solano Cty. Health & Social Servs. Dept.*, Case No. 06-1216, 2008 U.S. Dist. LEXIS 75757, at **50-51 (E.D. Cal. Aug. 15, 2008) ("Even if plaintiff had made her *prima facie* case, she must also demonstrate that she opposed the practice because she reasonably believed it to be discriminatory. * * * At the time plaintiff made inquiries regarding the promotions, plaintiff could not have reasonably believe that she was making a complaint about discrimination because she did not know who received the promotions, and **she did not know the race or qualifications of the individuals selected**. * * *") (emphasis added).

PageID#2756-57). But the District Court's analysis in this area misses the mark for the simple reason that there is no job posting requirement in Title VII; therefore, there can be no potential violation of Title VII.

Additionally, Kovacs could not have possessed a good faith belief that a job posting requirement was in effect because OFCCP regulations contain no such requirement—to the contrary, a position filled with an internal applicant is not required to be posted. Kovacs cannot cite to the conciliation agreement because she has never seen it, and it may not have been in effect. Additionally, UT is a federal contractor, and thus has obligations under Executive Order 11246, Section 503 of the Rehabilitation Act of 1973, and the Vietnam Veterans' Readjustment Assistance Act of 1974, as amended ("VEVRAA"). Under VEVRAA's "Equal opportunity clause," federal contractors are required to post all employment openings with the appropriate state employment service delivery system where the job opening occurs. 41 C.F.R. § 60-300.5(a)(2). However, the federal regulations provide that employment openings do not have to be posted when the job seeks executive and senior management; **when the position is filled internally**; or when the position will last three days or less. 41 C.F.R. § 60-300.5(a)(6). An employee's opposition activity must be both objectively reasonable and based on a "good faith belief" that the opposed practices are ***unlawful***. *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 270 (2001) (emphasis added). Kovacs fails to meet this good faith standard—

38

she never saw the conciliation agreement and did not know if it was in effect; and there is no posting requirement for Brown's position anyway pursuant to applicable regulations.

### B.    **Kovacs Cannot Demonstrate A Causal Connection**

Kovacs' last possible instance of protected activity was October 20, 2020.  She was notified of her termination on February 9, 2021.  The District Court properly found that this passage of time was insufficient to demonstrate temporal proximity.  Op., R.34, PageID#2762, citing *Kenney v. Aspen Technologies, Inc.*, 965 F.3d 443, 449 (6th Cir. 2020) ("[A] roughly 75-day delay between her protected activity and an adverse employment action is not, standing alone, a convincing case for proving causation."); *Imwalle v. Reliance Med. Prods.*, 515 F.3d 531, 550 (6th Cir. 2008) ("In this circuit, a period of more than four months was found to be too long to support an inference of causation.").

In the causal connection analysis of her Memorandum in Opposition to UT's Motion for Summary Judgment, Kovacs focused almost exclusively on her demotion.[5]   Opp. Memo., R.31, PageID#2709-12.   The only causal connection

---

[5] In her appellate brief, Kovacs primarily focuses on her argument that the probable cause finding should be considered in support of a causal connection.  She makes a passing reference to the first two arguments asserted before the District Court (she presumably abandons her pattern and practice argument), but she does not make any effort to develop these arguments or articulate how the District Court did not properly analyze them.  (Appellant Brief, pp. 37-38).

arguments she presented related to her termination are: (1) Schroeder lurked behind the adverse actions, (2) Wynn's January 26, 2021, conversation with McKether, and (3) there was a pattern or practice of discrimination occurring in the HR department. It is unclear if Kovacs attempts to connect these other acts to her demotion or her termination. *Id.*

The District Court easily and quickly discarded the first argument as Kovacs presented no evidence (because none exists) that Schroeder had any role in her termination. Kovacs now concedes as much. (Appellant Brief, p. 38). As the District Court found, "Plaintiff's arguments that Schroeder was "enmeshed" in her termination are supposition and unsupported." Op., R.34, PageID#2762.

With respect to Kovacs' argument regarding Wynn's conversation, the District Court properly found that it "is insufficient because Plaintiff has not set forth a legal basis on which I can rely on this additional fact as a cause for her hiring." *Id.,* at PageID#2764. Kovacs continues to fail to cite to any legal authority regarding the legal significance of discussions by an unrelated employee with non-decisionmakers. The District Court also correctly pointed out that Kovacs has not "set forth any evidentiary support that Elliott and Beck even knew about Wynn's complaint." *Id.* Kovacs makes no effort to connect Elliott and Beck to these conversations in her appellate brief. "[W]here some time elapses between when the employer learns of a protected activity and the subsequent adverse employment

action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality." *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 527 (6th Cir. 2008). Kovacs' "see what sticks" approach fails to establish other evidence of a causal connection.

### C. Kovacs' Probable Cause Finding Does Not Establish A Causal Connection

#### 1. Kovacs Waived Her Probable Cause Argument By Failing To Raise It In Opposition To UT's Motion For Summary Judgment

Although it undertook a substantive analysis of Kovacs' attempt to introduce her probable cause finding (presumably in an abundance of caution), the District Court properly determined that "Plaintiff did not present these arguments in her response to the motion for summary judgment, and it is too late to do so now." Op., R.40, PageID#2802, citing *Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 553 (6th Cir. 2008) ("we have found issues to be waived when they are raised for the first time in motions requesting reconsideration or in replies to responses."). The District Court went on to correctly observe that, "Plaintiff noted that the OCRC issued a finding of probable cause in her favor, but did not set forth the reasons why it should be evaluated as a causation factor for her *prima facie* case." *Id*.

There is no dispute that Kovacs did not mention the probable cause finding in her causal connection analysis. All she did was raise it in the facts section by flatly stating that the OCRC issued probable cause findings in her charge, as well as in the

charges filed by Davis, Wynn, and Chapman.  Opp. Memo., R.27, PageID#2643.
There is no mention of these findings in the legal analysis section whatsoever.
Kovacs asserts that she did not waive this argument because it is "referred to
throughout [her] brief in opposition to the MSJ," which is factually inaccurate; and
because she "expected" the District Court would consider the finding "based on
well-established federal law interpreting F.R.E. 803(8)."  (Appellant Brief, p. 39).
She cites no legal authority in support of her assertion.  Kovacs fails to understand
that it is not the court's responsibility "to identify and address the arguments that
[plaintiff] could have made but did not." *Geboy v. Brigano*, 489 F.3d 752, 767 (6th
Cir. 2007).

Although the Sixth Circuit has "never articulated precisely what constitutes
raising an issue with the district court, we have found issues to be waived when they
are raised for the first time in motions requesting reconsideration or in replies to
responses," which is precisely what occurred here. *See Scottsdale*, 513 F.3d at 553;
*Kitchen v. Whitmer*, 106 F.4th 525, 536 (6th Cir. 2024) ("The Sixth Circuit has
repeatedly held that 'an argument not raised before the district court is waived on
appeal," collecting cases).  Had Kovacs desired to utilize her probable cause finding
in support of her causal connection argument, she should have done so in her
summary judgment opposition brief.  She failed to do so, and this ends the analysis.
*Sault Ste. Marie Tribe of Chippewa Indians v. Engler*, 146 F.3d 367, 374 (6th Cir.

1998) ("[P]arties should not use [motions for reconsideration] to raise arguments which could, and should, have been made before judgment issued.") (internal citation omitted).

### 2.    *The District Court Properly Ascribed No Weight To The Probable Cause Finding*

The vast majority of Kovacs' legal argument focuses on her proposition that the OCRC's probable cause finding—in and of itself—creates a dispute of fact concerning the causal connection element.  Stated differently, Kovacs believes the District Court was handcuffed to the OCRC's findings and not permitted to independently analyze the factual record developed in this case.  Kovacs' probable cause argument is meritless as it is unsupported by the procedural framework of Title VII.  Indeed, her probable cause argument was tried and tested before the District Court, but the District Court correctly applied this Court's precedent to conclude that the finding did not assist in establishing the causal connection element.  Op., R.40, PageID#2799-806.

### a.    Title VII Does Not Require Courts To Give Deference To An Administrative Agency's Finding

Title VII requires employees allegedly aggrieved by employment discrimination to pursue administrative remedies through the Equal Employment Opportunity Commission (or an equivalent state agency) before pursing their claims in court.  42 U.S.C. § 2000e-5(e)(1).  If the employee's claims are not resolved

through the administrative agency, the employee may obtain a right-to-sue letter and then seek relief in court. *See* 42 U.S.C. § 2000e-5(f)(1).

Although the facts discovered during an EEOC investigation will inevitably overlap with the facts discovered during discovery of a lawsuit, they are independent processes. As discussed above, nothing in Title VII's statutory framework requires a court to give deference to the administrative agency's findings or conclusions. *EEOC v. Ford Motor Co.*, No. 95-3019, 1996 U.S. App. LEXIS 26263, at *26 (6th Cir. Sep. 30, 1996) ("Unlike many statutory administrative decision review procedures, where the courts of appeals owe deference to the factual findings of an administrative agency… Title VII [] is not one of these processes. ***In Title VII cases, either a jury or a district judge is the fact-finder***. The district court, and the court of appeals, ***owes no deference*** to what the EEOC thought the facts were when it brought the case before the district court.") (emphasis added). *Ford Motor* makes clear that the OCRC's probable cause finding in this case is owed no deference and undermines Kovacs' argument.

Kovacs repeatedly relies on this Court's *Alexander v. CareSource* precedent in her Appellate Brief. (Appellant Brief, pp. 22, 30-32). However, this reliance is misplaced, just as the plaintiff's reliance on the OCRC's finding was in *Alexander*. The *Alexander* plaintiff, like Kovacs, relied heavily on the probable cause finding to support her discrimination claim. *Id.*, at 561. But the District Court in *Alexander*

44

gave "no evidentiary weight" to this finding. *Id.*, at 562. While this Court did not agree with all of the District Court's reasons for doing so, it nonetheless agreed that the finding did not establish a material fact question. *Id.* Indeed, this Court harkened back to its opinion in *EEOC v. Ford Motor Co.*, in which it noted that "an EEOC cause determination carriers an evidentiary value of practically zero," and simply shows "the evidence of discrimination that the EEOC considered." *Id.*, citing *EEOC v. Ford Motor Co.*, 1996 U.S. App. LEXIS 26263, **26-27. This Court in *Alexander*, therefore, did not adopt the agency's conclusion but rather, "at the summary judgment stage…[considered] the report [] for the factual material it contains to determine if a fact questioned is raised." *Id.,* at 562. The *Alexander* Court evaluated this material and still affirmed summary judgment. *Id.,* at 563. Here, the District Court took the same approach, albeit after the summary judgement decision was rendered.

**(1)**    The District Court Addressed All Material Findings In The Probable Cause Determination

Kovacs repeatedly focuses on six statements[6] from the OCRC's probable cause finding in advancement of her causal connection argument. Mtn. for Recon., R.36, PageID#2774-75; Recon. Reply, R.38, PageID#2787-88; Appellant Brief,

---

[6] The bulleted list includes seven statements. However, the seventh statement is a conclusion that is not germane to this case: "Had it not been for Kovacs' **race** it would not have been necessary for the University to terminate her." (emphasis added).

pp. 36-37.  Clearly, Kovacs thinks this list moves the causal connection needle in her favor.  However, Kovacs ignores the fact that the District Court reviewed each of these points, either in the "Undisputed Facts" or "Disputed Facts: Plaintiff's Position."  Op., R.34, PageID#2745-51.  And several of these points were analyzed and discarded by the District Court in its causal connection analysis.  *Id.,* at PageID#2760-64.

In other words, the District Court analyzed the same evidence considered by the OCRC investigator pertinent to his probable cause finding, but simply either found it irrelevant (i.e., Kovacs served in her demoted position for a short period of time) or legally insignificant (i.e., Wynn's conversation with McKether was not protected activity, and any temporal proximity to Kovacs' termination is not the appropriate analysis).  Kovacs' repeated highlighting of what the OCRC investigator found significant is of no import given the District Court's review of the exact same evidence.  "Because the lower court considered the same facts as the agency, the differing *conclusion* in the agency report does not by itself establish a material issue of fact, and there is no error by the district court in not assigning evidentiary weight to that conclusion."  *Alexander*, 576 F.3d at 563.  This is precisely what happened here.  Kovacs' use of the probable cause finding as a crutch to survive summary judgment should be denied.

### b.    The District Court Properly Explained Why It Did Not Rely On The Probable Cause Finding

*Alexander* instructs that a trustworthiness analysis should be undertaken when analyzing the import of a probable cause finding, and sets forth a four-factor test for doing so. *Alexander*, 576 F.3d at 563. As discussed above, the District Court undertook such an analysis, identifying no less than five discrete trustworthiness issues presented by the OCRC's finding. Op., R.40, PageID#2804-05. They are not repeated here for the sake of brevity, but the point is that the District Court acknowledged the trustworthiness test applicable to cause findings as espoused in *Alexander*, and then conducted such a trustworthiness analysis.

One of the most important findings the District Court reached, because it directly impacts a temporal proximity analysis, is that the OCRC improperly found that Wynn's conversations should be deemed protected activity. Op., R.40, PageID#2804. The OCRC presumably concluded that the temporal proximity between (1) Wynn and McKether's January 26, 2021 conversation and (2) Kovacs' termination, was sufficient to establish a causal connection. P.C. Finding, R.1-6, PageID#33. The District Court, however, easily found held that Wynn and McKether's discussion was not factually or legally significant. Op., R.34, PageID#2763-64.

The District Court also correctly highlighted how the OCRC "blend[ed] its analysis of race discrimination with its analysis of retaliation." Op., R.40,

47

PageID#2805. The District Court was tasked with ruling on a retaliation claim only. Thus, "conflation of the two different theories [race discrimination and retaliation] is likely to be confusing and unhelpful to a factfinder." *Id*. Given that the probable cause finding went beyond the scope of a retaliation claim, and intermingled its analysis of race discrimination with retaliation, the District Court correctly disregarded it and independently determined that UT was entitled to summary judgment.

As set forth in its summary judgment opinion, the temporal proximity between Kovacs' protected activity and her termination (which was nearly four months) was inadequate on its own to establish a causal connection. In its summary judgment opinion, the District Court found Kovacs' arguments in support of a causal connection to be based on "suppositions and speculation." Op., R.34, PageID#2767.

In its motion for reconsideration opinion, the District Court found that Kovacs' attempt to establish a causal connection by combining temporal proximity (inadequate on its own) with the OCRC cause finding (which was also inadequate on its own) was insufficient to overcome summary judgment. Op., R.40, PageID#2801. Even if Kovacs' arguments regarding the OCRC's probable cause finding are considered, she still cannot establish a causal connection.

**D.**    **Kovacs Cannot Demonstrate Pretext**

In the event this Court finds that Kovacs established a *prima facie* case, it can still address the merits of UT's pretext argument. *See Adamov v. United States Bank Nat'l Ass'n*, 681 F. App'x 473, 479 (6th Cir. 2017) ("Although the district court did not address pretext because it awarded summary judgment on prima-facie grounds, this court may address issues raised by the parties on appeal even where the district court has not explicitly ruled on the issues.") (internal citation omitted).

To demonstrate pretext, Kovacs must show both that UT's proffered "reason was false, and that [retaliation] was the real reason." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993). Kovacs offered minimal evidence why the reasons UT put forth are pretexts for retaliation. She cannot show that the reasons for her termination: 1) had no basis in fact; 2) were not the actual reasons; or, 3) were insufficient to explain the decision. *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994).

Kovacs cites to the *Manzer* factors, but does not identify which one(s) she utilizes to establish pretext. While it is less than clear, UT presumes she proceeds under the first prong because she addresses UT's honest belief defense (Opp. Memo., R.27, PageID#2653-54), which is used by employers to rebut the "no basis in fact" argument. *See Briggs v. Univ. of Cincinnati*, 11 F.4th 498, 515 (6th Cir. 2021). This first category includes evidence that the employer's basis for the

plaintiff's discharge never happened. *Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 349 (6th Cir. 2012). But contrary to her election of this path in the Opp. Memo, Kovacs does not dispute her abdication of key responsibilities for mentoring staff and handling two major projects. Instead, she doubles-down on her Wynn/McKether theory and oddly asserts that she "was fired because she is white." *Id.,* at PageID#2654. The District Court shot down the Wynn/McKether theory, which Kovacs also attempts to use to establish a causal connection, as analyzed above. It does not impact pretext either.

In determining whether UT had an "honest belief" in its reasons for termination, the Court examines whether the decisionmakers established a "reasonable reliance" on the particularized facts available to them. *Braithwaite v. Timken Co.*, 258 F.3d 488, 494 (6th Cir. 2001). "The critical inquiry is whether Defendants made a 'reasonably informed and considered decision.'" *Id.*, quoting *Smith v. Chrysler Corp.*, 155 F.3d 799, 806-07 (6th Cir. 1998). "[W]e do not require that the decisional process used by the employer be optimal or that it left no stone unturned. Rather, the key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action." *Id.* Here, Kovacs has failed to cite any evidence suggesting that the decisionmakers did not hold an honest belief in the reasons for removing her or that they failed to make a "reasonably informed and considered decision." *See Abdulnour v. Campbell Soup*

*Supply Co. LLC*, 502 F.3d 496, 806-07 (6th Cir. 2007) (affirming summary judgment for employer where decisionmaker had before him complaints about plaintiff's inadequate job performance and demeaning treatment of others, and where decisionmaker personally observed that plaintiff failed to address problems that were his responsibility). The *Abdulnour* Court found the decision was insulated by the honest belief rule even when the employer had numerous reasons for the plaintiff's removal, but only told the plaintiff he was being terminated for a "personality conflict," and not poor performance; and were "skeptical of undocumented accounts of employee conduct that may have been created post-termination." *Id.,* at 503.

This defense is all the more applicable under the present circumstances when analyzed against the backdrop of HR modernization instituted by President Postel. Numerous personnel decisions were made as part of this modernization (i.e., the terminations of Davis, Chapman, and Wynn, which pre-dated Kovacs' termination). Courts have long held that the new manager has the right to appraise employees under their standards, as "[w]hat may have satisfied one management regime does not necessarily satisfy its successor." *Wright v. Sears, Roebuck v. Co.*, 81 F. App'x 37, 42 (6th Cir. 2007).

Moreover, Kovacs makes no attempt to rebut the final straw in her termination: her comment to Ziviski that she "wasn't busy and wanted a different role." Ziviski Dec., R.18-1, ¶¶ 4-7, PageID#1076-77. As discussed above, this

comment was significant to the decisionmakers given its audacity—the HR Department was swamped with work at that time. The decisionmakers "reasonably relied" on Kovacs' comment to Ziviski, and Kovacs makes no attempt to rebut this. Hurst Depo., R.16-1, PageID#805-06; Elliott Depo., R.15-1, PageID#627; Beck Dec., R.18-2, ¶ 10, PageID#1080.

Moreover, to the extent Kovacs relies on the "shifting reasons" doctrine, her attempt fails. Kovacs claims that she was told by UT that she was terminated because it was "going in a different direction." (Opp. Memo., R.27, PageID#2653). But this Court has made clear that an employer is not required to give all the reasons for an employment action in the initial termination conversation. *See Fitzpatrick v. Henderson*, 55 F. App'x 248, 251 (6th Cir. 2002):

> Fitzpatrick next claims Johnston gave "shifting" reasons. Fitzpatrick argues that Johnston told Tolliver he denied the extension because of the settlement agreement but later gave different reasons in his deposition and EEO testimony. Fitzpatrick, however, testified that Johnston told her he denied the extension because of the one-year policy and the needs of the Fremont community and employees. **Even if Johnston did not give Tolliver all his reasons, which he was not required to do, Johnston's later explanations of the reasons for his decision are supported by Fitzpatrick's own testimony.**

Kovacs does not, and cannot, argue that UT has provided shifting reasons for its termination decision. UT provided further explanation to the Civil Rights Commission, and that explanation has remained the same ever since. Kovacs does

not argue otherwise; rather, she asserts that she should have been given all reasons at the time of her termination.  But UT was under no obligation to do so.

Applying this case law to this matter, Kovacs cannot meet her burden of demonstrating that UT's reasons for her termination were pretexts for retaliation.

## VIII.  <u>CONCLUSION</u>

For these reasons, this Court should affirm the District Court's judgment.

Respectfully submitted,

**DAVE YOST**
**Attorney General of Ohio**


*/s/ Drew C. Piersall*
Drew C. Piersall, *Counsel of Record*
LITTLER MENDELSON, P.C.
41 South High Street, Suite 3250
Columbus, OH  43215
Telephone:   614.463.4251
Facsimile:   380.210.1815
Email:        dpiersall@littler.com

*Counsel for Appellee University of Toledo*

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify, in accordance with Rule 32(g) of the Federal Rules of Appellate Procedure, this brief complies with the type-volume requirements for a principal brief and contains 11,663 words. *See* Fed. R. App. P. 32(1)(7)(B)(i).

I further certify that this brief complies with the typeface requirements of Federal Rule 32(a)(5) and the type-style requirements of Federal Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

*/s/ Drew C. Piersall*
Drew C. Piersall

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on April 16, 2025, this brief was filed electronically. Notice of this filing will be sent to all parties for whom counsel has entered an appearance by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

*/s/ Drew C. Piersall*

Drew C. Piersall

## ADDENDUM—DESIGNATION OF RELEVANT DISTRICT COURT RECORD DOCUMENTS

Defendant-Appellee, pursuant to Sixth Circuit Rule 30(g), designates the following filings from the District Court's electronic records:

| DOCUMENT | RECORD NUMBER (R.#) | PAGE ID NUMBERS (PAGEID#) |
|---|---|---|
| Complaint | 1 | 0001-0061 |
| • Exhibit 4—OCRC Letter of Determination— Finding of Probable Cause | 1-6 | 0030-0036 |
| Deposition Transcript of Theresa A. Kovacs | 14-1 | 0122-0570 |
| • Exhibit A—Offer Letter to Kovacs | 14-1 | 0413 |
| • Exhibit B—Position Description | 14-1 | 0418-0421 |
| • Exhibit EE—Rebuttal to Respondent's Position Statement | 14-1 | 0456-0474 |
| • Exhibit I—E-mail | 14-1 | 0496-0509 |
| • Exhibit J—Supervisor E-mail | 14-1 | 0511-0512 |
| • Exhibit K—E-mail | 14-1 | 0514 |
| • Exhibit P—Demotion Letter to Kovacs | 14-1 | 0541-0542 |
| • Exhibit R—Reporting E-mail | 14-1 | 0547 |
| • Exhibit W—Termination Letter to Kovacs | 14-1 | 0564 |
| Deposition Transcript of John Elliott | 15-1 | 0573-0741 |
| • Exhibit 1—Offer Letter to Elliott | 15-1 | 0687-0688 |
| • Exhibit 4—Affidavit of John Elliott | 15-1 | 0692-0694 |
| Deposition Transcript of Melissa Hurst | 16-1 | 0744-0901 |
| • Exhibit 6—Affidavit of Melissa Hurst | 16-1 | 0871-0872 |
| Deposition Transcript of Matthew Schroeder | 17-1 | 0904-1039 |
| Declaration of Bethany Ziviski | 18-1 | 1076-1077 |

| DOCUMENT | RECORD NUMBER (R.#) | PAGE ID NUMBERS (PAGEID#) |
|---|---|---|
| Declaration of Jason Beck | 18-2 | 1078-1081 |
| Deposition Transcript of Matthew Schroeder | 19-1 | 1084-1131 |
| Deposition Transcript of Gregory Postel, M.D. | 20-1 | 1134-1268 |
| Plaintiff's Motion for Judicial Notice (Fed. R. Evid. 201) (Chapman) | 21 | 1269-1298 |
| Plaintiff's Motion for Judicial Notice (Fed. R. Evid. 201) (OCRC) | 22 | 1299-2074 |
| Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment | 27 | 2629-2656 |
| Plaintiff's Amended Brief in Opposition to Defendant's Motion for Summary Judgment | 31 | 2687-2718 |
| Order denying Plaintiff's Motions for Judicial Notice | 32 | 2719-2724 |
| Order granting in part/denying in part Defendant's Motion for Summary Judgment | 34 | 2745-2767 |
| Plaintiff's Motion for Partial Reconsideration of January 10, 2024 Ruling on Motion for Summary Judgment | 36 | 2770-2778 |
| Reply Brief in Support of Plaintiff's Motion for Partial Reconsideration of January 10, 2024 Ruling on Motion for Summary Judgment | 38 | 2785-2789 |
| Amended Order denying Plaintiff's Motion for Partial Reconsideration | 40 | 2799-2806 |
| Plaintiff's Motion to Certify Order for Interlocutory Appeal | 42 | 2808-2821 |
| Order denying Certification for Appeal | 49 | 2859-2863 |
| Stipulation of Dismissal | 63 | 2938-2940 |
| Order granting Stipulation of Dismissal | 64 | 2941-2943 |
| Plaintiff's Notice of Appeal | 65 | 2944-2945 |

4935-9325-6757 / 128983.1002